HON. PIERPOINT ISHAM, } ASSISTANT JUDGES.
HON. MILO L. BENNETT, }

---

JOHN JACKSON *v.* RUTLAND & BURLINGTON RAILROAD CO.

*Railroad Companies. Damages.*

The owner of animals suffered to go astray, and *trespassing* upon a railroad, cannot recover for their destruction by a train, without negligence on the part of the servants of the company, even where the company is under a special statutory obligation to fence their road, and have omitted to do so.

A railway company have the right at all times to the exclusive occupancy of the land taken for their road, and the right to exclude all concurrent occupancy, by the former owners, in any mode and for any purpose.

And their obligation to fence only extends to the owner or rightful occupier of the adjoining fields, and against cattle *rightfully in such adjoining fields.*

A railway company will be liable for either recklessness, or want of common care, at the time, and after cattle are discovered by them on their track, or for wanton injury.

Jackson *v.* Rutland & Burlington Railroad Co.

TRESPASS ON THE CASE, brought to recover the value of two horses, killed upon the track of defendants' road, by a train in motion.   Plea, general issue and trial by jury.

On trial, the parties agreed upon the following statement of facts, which contains all the material evidence in the case.

That by the provisions of their charter, as well as by the general law of the State, the defendants were required " to build and maintain *sufficient fence,* upon each side of their railroad, through the whole route thereof."

That, at the station at Brandon, the railroad crosses a public highway at right angles, at or near grade, and the lands for a certain distance on each side of the highway are used for depot purposes ; that the company have omitted to fence certain lands directly adjacent to their road on the east side of the highway, and that the owners of some of these lands consented to this omission. That the horses, which were kept in plaintiff's pasture, *a mile or a mile and a half distant* from the railroad, escaped from the pasture and came upon the track, by crossing either the highway or the lands unfenced with the owner's consent, or those unfenced for other reasons, and there were run over by an early train.   That it was too dark at the time of the accident for the engineer to discover the horses in season to check the train ; and no negligence in that respect was attributed to the defendants.

The County Court,—COLLAMER, J., presiding,—decided *pro forma,* that the plaintiff was entitled to recover, and so charged the jury, and directed a verdict for the plaintiff.

Exceptions by defendants.

*Charles L. Williams* for defendants.

The declaration does not complain of, nor does the case show any neglect by the defendants, in discharge of any duty, of which the plaintiff has a right to complain.

The obligation imposed upon the defendants by their charter to build and maintain sufficient fences, &c., is for the benefit of the adjoining land-owner ; and if he consents to its omission, no one else can complain.

Though the language in which the obligation is stated and imposed is general, it must be construed in reference to the object to be secured, and the rights and interests of those to be affected by its fulfilment.

A literal compliance with the provision would require the erection of fences across the highways where the railroad crossed them ; but such a construction would be unnatural, unreasonable and absurd; and so would be any other construction except the one for which we contend, which is—that the obligation to erect fences, &c., is merely one which is imposed for the benefit of, and one which the railroad company is under to, the adjoining land-owner, and to him alone.

In this view of the case, the adjoining land-owner could surely waive the benefit of the provision if he chose to ; and if he did, no one else could complain.

In the present case it appears that on the south side of the railroad the land is open and unenclosed, used for a lumber yard, passage way for teams, brick yard, &c., and that the defendants have omitted " *with the consent of the land-owners, to build fences against either of those lots.*"

Is any blame ascribable to the defendants for this omission ? and if not, why should they be made chargeable for an accident occurring perhaps only through this omission?

The case finds that the horses passed either over this unenclosed land, or else across a field from a highway east,—and if, in the former case, the defendants would not be liable, the jury should have found that such was not the case ; and the course taken by the court, in directing a verdict without such a finding, was erroneous.

Had the defendants made no arrangement with the land-owners, and fenced their railroads in full compliance with the provision for that purpose, the accident might not have been prevented. The railroad, it appears, crosses the highway at or near grade. *It will* not be pretended that the defendants were obliged to fence either across their railroad or across the highway. And in reference to cattle-guards, there is no provision whatever for their erection. The plaintiff's horses could have passed from the highway down the railroad had it been fully fenced, and in that case the defendants surely would not have been liable.

And unless it could be made to appear, and the jury should find that but for the negligence of the defendants in not erecting fences the accident would not have happened, the defendants should not have been declared liable ; and there was error in the court's giving a different direction and charge.

But without reference to the particular direction from which the plaintiff's horses came upon the railroad, we contend that the plaintiff cannot recover, for the reason—That his horses were not rightfully either in the highway or upon the adjoining fields, from which they entered upon the railroad. And the fault and neglect of the plaintiff himself was thus a contributing cause to the injury he has sustained.

The case finds that no fault is attributable to the defendants on account of the engineer's management, and it further finds, that the plaintiff owned and had no interest in any of the lands in that vicinity, (i. e. where the accident happened,) and that the pasture where the horses should have been, and from which they escaped *the day* or *the day but one before*, was 1 or 1½ miles distant, and in a direction from the plaintiff's residence different and opposite from that of the place where they were killed.

And under this state of facts, we apprehend that the following cases will be found full, direct and conclusive authorities against the right of the plaintiff to recover.

*Rust* v. *Low*, 6 Mass. 90, which decides, that one obliged by proscription at common law to fence his close, is only obliged to fence against cattle which are *rightfully* on an adjoining close.

*Dovaston* v. *Payne*, 2 Hen. Black. 527, which is to the effect that cattle being in the highway are trespassers there, unless they are merely *passing* and *repassing*.

*Blythe* v. *Topham*, Cro. Jac. 158. An action will not lie for digging a pit in a common, by means of which a *stray mare* tumbles in and perishes.

*Williams* v. *Michigan Central Railroad Co.*, decided by Supreme Court of Michigan, Jan. 7, 1851. *New York & Erie R. R. Co.* v. *Skinner*, Sup. Ct. of Penn., Sept. 1852. Am. Law Register p. 97.—*Tonawanda R. R. Co.* v. *Munger*, 4 Comstock, S. C.—5 Denio 255.—*Trow* v. *Vt. Central R. R. Co.*, 24 Vt. 487, all of which are analogous cases to the present.

*Briggs & Conant* for plaintiff.

I. The defendants' charter provides that "*the corporation shall build and maintain a sufficient fence upon each side of their railroad, through the whole route thereof.*" (Acts of 1843, No. 54 § 14.)

XXV.　　11

The construction of this clause is the chief legal inquiry which arises upon the facts disclosed in the case.

This provision imposes upon the company an absolute condition. It is *binding* upon them, without reference to the wishes or interests of adjoining proprietors merely ; and is intended for the protection and benefit of the whole public. And this position we argue, both from the language and from the reason of the law. For

1. The language is positive and unqualified. It is not left to the control of adjoining proprietors. To give it such an import would be doing violence to any plain phraseology. Had the Legislature intended to express what we claim, they could have selected no words more pointed, intelligible or emphatic.

The language is unlike the language of the law regulating the erection of fences in ordinary cases. In the Comp. Stat. p. 525, § 10, it is provided that adjoining owners shall make and maintain a just proportion of the fences, *unless they choose to let their lands lie open and vacant.* No such exception is made in favor of the R. R. Co. In *their* case the language is imperative and absolute. They " *shall build and maintain a sufficient fence.*" Why is this broad distinction made ?

2. The last question cannot be answered satisfactorily, except on the ground that this provision is intended for the general protection of the entire public ; and this we urge, in the second place, is the only consistent view which can be taken of the *reason* of the law.

The operation of railroads is attended with great peril, both to property and life. It is a dictate of the commonest prudence to require of those interested in them, such protection to the community as the case admits. If they are left unfenced, the property of every man is liable to stray upon them, without his fault, and be destroyed. And therefore we urge that the Legislature must clearly have intended that protection to the public which their language most naturally imports.

It is also of great importance to the *traveling* public that a railroad should be well fenced ; and we cannot doubt that this consideration was one of the reasons for inserting this provision in the charter. No railroad, which is liable to the incursions of animals, can be operated at the speed now deemed requisite, without endangering the lives of all who travel upon it. It cannot be believed that the Legislature was insensible to these dangers, or that in view

of them, they should have intended to require a less effectual safeguard against them, than "*a sufficient fence upon each side of the road through the whole route thereof.*"

3. The duty of maintaining fences implies the duty of making cattle-guards at the highway crossings. For the provision must be so construed as to give it its proper effect ; and fences without cattle-guards would be of little avail to protect the public.

The case finds that cattle-guards *at the station yard* are impracticable. The station grounds, it is said, must be left open to the highway. But it is easy to place cattle-guards at the *limits* of the station yard, at least; and we urge that the company cannot make this apology in a court of law, until they have done all for the public protection which *is* practicable in the circumstances. Unless the station yard is fenced and protected by cattle-guards at its *termini*, the entire road is left open to the highway, and the provision of the charter becomes nugatory.

II. The case shows that the defendants did not provide fences or cattle-guards according to the provision of the charter ; and we insist, that in point of fact, the loss sustained by the plaintiff was in consequence of this wrongful neglect.

It is admitted that the horses *may* have come upon the road across an adjoining field. In that alternative, it is very clear that a sufficient fence would have prevented them from gaining access to the road.

In the other alternative, the horses (entering directly from the highway) would not have been liable to injury, had the station yard been duly fenced and protected at its limits by cattle-guards. Such a yard, used exclusively for depot purposes, would offer no inducement to animals to enter ; or, if to enter, certainly none to remain.

In point of fact, the spot where the horses lay, was not within that part of the grounds actually used for a station yard ; and had the station yard been duly fenced and guarded, the horses lying in any part of it would readily have escaped to the highway, on approach of the train.

The opinion of the court was delivered by

REDFIELD, Ch. J. The question arises, for whose benefit is the company required to maintain the fences on each side of their

road ? This will, in a good degree, determine who may have an action for injuries consequent upon the omission to build or to maintain such fences. For right and obligation, in regard to these matters, are, for the most part, correlative and coextensive. One cannot ordinarily have an action for any evil consequences he may suffer, by reason of the omission to perform a duty not owing to himself. There is, in law, no such privity between one remotely affected by such omission, and the person owing the duty, as will lay the foundation for an action. *Fitzsimmons* v. *Joslyn,* 21 Vt. 129.

We cannot conceive, then, how any one can be said to be directly interested in the maintaining of fences upon a railway, beyond the adjoining proprietors of land, and those who may travel upon the road, either as passengers or workmen. And, in regard to this latter class of persons, who are only interested in this matter temporarily, for the purpose of their own security while upon the road, we have no occasion to speak here. The adjoining proprietors certainly are primarily and principally interested in the maintaining of fences upon the line of railways. There is no doubt a remote, incidental, and contingent interest in all the citizens, in having such roads carefully fenced. One's teams, cattle, and children even, are thereby rendered less likely to receive damage by reason of the running of such roads. But this is an interest of so remote and contingent a character, as scarcely to be supposed to form the basis of so extensive and expensive a charge upon such companies by the legislature ; certainly it should not be so held, unless so expressed, *in totidem verbis,* or by the most obvious implication.

Assuming, then, that this general provision in the character of this company is for the benefit of the land-owners, and to prevent all uncertainty of construction as to the party upon whom this burden ought to rest ; it seems to follow, that only the adjoining proprietors can complain of the omission, and that a proprietor can only complain of the omission adjacent to his own land. This enactment only places the defendants in the position of an adjoining proprietor, who is bound by contract or prescription to build the fences between himself and an adjoining proprietor. The statute imposes this burden exclusively upon the railway, which, as between adjoining proprietors, generally, is to be borne jointly and

equally. But the matter of such division fence is always a subject of stipulation between the adjoining occupants or proprietors, or may become so, at any time, without the right of interference by any other one. Hence it was competent for the defendants to stipulate with the land-owners adjoining the road, to let the land remain unfenced, or to assume that burden themselves, and no other land-owner could complain upon the mere ground of the increased liability to injury of his cattle.

The idea of any obligation upon railways to fence their roads, for the security of cattle passing along the highway, must rest upon the hypothesis that such cattle are rightfully in the highway. Cattle are rightfully driven along the highway, and in such case, if fences and cattle-guards are omitted where they can be properly kept up, consistent with the proper use of the railway, and damage ensues, very possibly an action may lie. But in the present case, the cattle were estrays upon the highway. They could certainly claim to be regarded in no more favorable light. And in this state it is not now considered that the owners of cattle have any right to depasture them in the highway. The owner of cattle is here left, since the Revised Statutes of 1839, as at common law. He is bound to keep his cattle at home. If found doing damage in one's field, they may be impounded, without reference to the legality of the outward fences of the field, where such cattle are found. Fences adjoining the highway are expressly excepted by the statute while all other fences surrounding such field, are required to be found legal in order to justify the party distraining. We are then compelled to fall back on the common law, as to the obligation to build fences adjoining the highway, and the right of the owners of cattle to feed them in the highway. And here there seems little doubt.

At common law, the subject of fences is seldom much discussed, it being every man's duty to keep his own fields fenced for the purpose of restraining his own cattle, rather than those of others. If his cattle went at large, and did damage, they are liable to distress as matter of course, unless in some way the owner could show a right to have his cattle where they were found, or unless some prescription or contract changed the general obligation to fence.

This subject is a good deal discussed in the English books, in re-

gard to rights of common and pasturage; but the question in regard to fences never arises, unless as connected with certain rights of exclusion from the commons, permanently or temporarily, or in regard to some prescription or duty, attaching to the land. And so, fences are always good enough at common law, which answers their end, of keeping one's own cattle inclosed, and always insufficient, if they fail to answer that purpose. If one's cattle went abroad, either by permission or accident, the owner was liable for all damage. One had no right to depasture his cattle in the highway. For by so doing, he was infringing the rights of the owner of the soil and freehold, although encumbered by the public right of way. This right of way gave the public no right to the trees and herbage growing upon the land, or to the stone and minerals under the soil. That was as much the property of the owner of the freehold as before. Cattle have only the right of *passage* upon the highway; if upon it for any other purpose, they are trespassing. (2 Roll. Ab. 566, pl. 1. *Dovaston* v. *Paine,* 2 H. B. 527.

It is no where pretended that taking land for a highway gives the public anything more than a right of way in the land. And if all the other rights in the soil remain to the owner as before, and this is no where questioned, but recognized in all the cases at common law, we do not readily comprehend how any one can be said to have any more right to have his cattle in the highway, either as estrays or *levant* and *couchant,* than in any other man's field. And such is the language of the cases upon the subject. But it is competent, no doubt, for the owner of land incumbered by the highway, to occupy it in common, as is generally done in this State, and to suffer others, not having any interest in such lands, to feed cattle in the highway; and so long as he acquiesces in this mode of occupying the highway, and until he gives notice of dissent, he may probably be bound by it. But I should entertain no doubt of the right of any one to dissent from any such arrangement by common consent, and exclude cattle from his lands, across which the highway passed, and to maintain an action against the owner of cattle depasturing upon such lands, after notice to restrain them. And it is certain that our statute since 1839, expressly excuses all land-holders from fencing adjoining the highway. For if they may impound cattle found doing damage in a field where the fence is not legal, they may where there is no fence; and by parity of

reasoning, if cattle are thus liable to distress, it must follow that they are wrong-doers in the highway, as, if they were rightfully there, the adjoining proprietors must of necessity be made to fence against them. And if land-owners generally are not bound to fence their lands off from the highway, much less should railway companies be required to do so. For in most cases, such a requirement of them would, on the present plan of crossing highways at grade, be altogether impracticable, and would impose upon such companies the burden of raising their roads and station-houses above grade, so as to exclude all highways from their level, which it is believed was never required by their charters.

The right of a railway company to the exclusive possession of the land taken for the purposes of their road, differs very essentially from that of the public in the land taken for a common highway. The railway company must, from the very nature of their operations, in order to the security of their passengers, workmen, and the enjoyment of the road, have the right at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy, by the former owners, in any mode and for any purpose. Any other view of the subject must lead to the imminent peril of life and property, and ultimately to the most glaring absurdities. How far this difference will affect the right of the former owners to the herbage growing upon the land, or to dig up the soil and subsoil, it is not needful here to consider. It is obvious that the right of the railway to the exclusive occupancy must be, for all the purposes of the roads, much the same as that of an owner in fee ; and the company certainly owes no duty to persons or property in the highway, or the fields adjoining the railway, unless rightfully there. Hence, from what has been said, we must conclude that estrays, or cattle suffered to go at large in the highways for the purpose of pasturage, are altogether at the risk of the owners, until they are brought back to some point where they may rightfully remain. And the fact that the business of the defendants is one of extraordinary peril to cattle coming upon the road, can make no difference.

The business of the defendants is one legalized by the legislature, by universal consent, and one where the public, at present, make very extraordinary demands in regard to speed, which it would be ruinous to the interests of defendants to disregard. Un-

der such contingencies, it is of the first necessity that cattle should be excluded altogether, and beyond all peradventure, from the track of the railway. This, it is impossible for the company to do effectually, short of a very disproportionate expense. But the owners of cattle may each restrain his own, as the law requires him to do, with very little difficulty. And if this is not done, the loss should fall upon the owner, who is legally in fault.

And if sometimes, through defect of fences, or from any other cause not implying moral delinquency, his cattle stray accidentally, so to speak, upon the railway, he must be content to take the chance of their destruction, and under the circumstances, should, one would think, deem himself fortunate if no greater damage is sustained by any one than the destruction of the cattle, where so much must of necessity be put to hazard. And this has always been regarded as the law upon analogous subjects, where animals trespassing have met their destruction. (*Blythe* v. *Topham,* Cro. Jac. 158. *Drane* v. *Clayton,* 7 Taunton, 789, 2 Eng. C. L. R. 183. *Scott* v. *Wilkes,* 3 Barn. & A. 304. 5 Eng. C. L. R. 295. *Bird* v. *Holbrook,* 4 Bings. 628. *Jordin* v. *Crump,* 8 M. & W. 781 (1841.) *Townsend* v. *Walker,* 9 East R. 277. *Bush* v. *Brainard,* 1 Cow. R. 78. *Johnson* v. *Patterson,* 14 Conn. R. I.)

The principle of these cases, applied *to the* case in hand, would certainly most obviously require that plaintiff should keep his cattle off defendants' road, or else not complain of their destruction.

But a brief consideration of the rules of the common law, in regard to the rights and liabilities of different parties in reference to fences, will show still more obviously the utter want of foundation in the plaintiff's claim. It is well settled, that where one suffers loss through the want or insufficiency of fences which he is himself bound to repair, he cannot recover. If then the obligation upon defendants to build a fence along their road, is a duty to the adjoining proprietors only, and by consequence may be omitted or shifted to the other party by his consent, it must follow, that in such event, that party could not recover for any damage done to his cattle by the company, and of course no third party could recover of them for damage done to his cattle by straying into said field, and thence upon the track of the railroad, if it was at the time, the duty of the *land-owners* to fence the land. And it certainly could not be fairly contended that the owner of such cattle, which were

trespassing in such field, could recover of the owner of the field for not fencing it. If so, any trespasser might recover of a party for damages sustained by reason of the land not being kept in the safest possible state, for all uses to which anybody might choose to put it ; which would be absurd, and at variance with all the cases upon the subject.

But in looking farther into the law upon this subject, it will appear that even while the obligation to fence rests upon the defendants, they are only bound to fence against cattle *rightfully in such adjoining fields.* This obligation to fence only extends to the owner or rightful occupier of the adjoining fields, and not to mere trespassers there, and stray cattle are nothing but trespassers, presumed to have escaped through the insufficiency of their owners' fences, which in law is the same as if the owner had suffered them to go at large without any restraint whatever. (Fitzherbert N. B. 298. *Rust* v. *Low*, 6 Mass. 99.)

The result of all our examination then is, that the plaintiff's horses were at large through the defect of his own fences, so far as the case shows, and were trespassers upon the defendants' lands, and the plaintiff had no legal claim either upon the defendants or the adjoining proprietors, to keep the railroad on the adjoining lands fenced for the security of the plaintiff's cattle, while thus going at large ; and that he has no remedy against any one, if they were killed by defendants' engines, without negligence at the time, in the management of the engines. This view of the case is fully sustained in a late case in the Common Pleas in England. (*Ricketts* v. *The East and West India Docks and Birmingham Junction Railway Company,* 12 Eng. Law and Equity Reports, 520,) which is this identical case almost, in so many words, *nomine mutato.* The note of this case is in these words : " Where the plaintiff's " sheep, trespassing in A.'s close, strayed on the defendants railway "which adjoined, through defect of fences which the defendants were " bound as against A. to make and maintain, and were killed—Held, " that the plaintiff could not recover either at common law (or un- " der the English statute of 89 Victoria, ch. 20, section 68,) or on " the ground that the defendants exercised a dangerous trade, the " obligation to make and maintain fences, both at common law and " by the statute, applying only as against the owners or occupiers "of the adjoining close." The only difference in the two cases

seems to be in the names of the parties, and the kind of cattle killed.

The American courts have, for the most part, adopted the views we have taken of this case, in regard to the right of cattle to depasture in the highways, and the liability of railways for killing them, when casually upon their roads. (*Little* v. *Lathrop*, 5 Greenleaf, 156. *Lord* v. *Wormwood*, 29 Me. R. 282. *Perkins* v. *Eastern Railroad Company* ib. 307. *Wells* v. *Howell*, 19 Johns. 387. *Hallowday* v. *Marsh*, 3 Wend. R. 142. *The Tonawanda R. R. Co*, v. *Munger*, 5 Denio, 255, S. C. affirmed, 4 Comst. 255.) And in some of the States, it is held even, that the negligence of the railway company, in driving their engines at the time, will not render them liable for killing cattle thus wrongfully upon the road. (*Clark* v. *Syracuse & Utica Railroad Company*, 11 Barbour R. 112. *Williams* v. *The Michigan Central R. R. Company*, decided in 1851. *New York & Erie Railroad* v. *Skinner*, Supreme Court of Pennsylvania, Dec. No. Law Register, 97.) But this last proposition is expressly repudiated in the English cases upon this subject, and is most unquestionably unsound. The railroad company cannot justify either recklessness, want of common care, at the time and after the cattle are discovered, or wanton injury. But short of that, it seems they are not liable, either upon principle or the decided cases.

The judgment of the County Court is reversed, and judgment upon the case stated, entered for the defendants.