### WRIGHT et al. v. ST. LOUIS SOUTHWESTERN RY. CO.

(Circuit Court, W. D. Arkansas, Texarkana Division. January 7, 1910.)

**1. EQUITY (§§ 219, 263*)—PLEADING—CROSS-BILL.**

A cross-bill filed by the defendant in a suit in equity in a federal court, which makes no one defendant and which prays for no process, and on which no process is issued, is a nullity, and should be attacked by a motion to strike, and not by demurrer.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 487, 496–500, 535–540; Dec. Dig. §§ 219, 263.*]

**2. EASEMENTS (§ 61*)—INJUNCTION (§ 9*)—PROTECTION OF EASEMENT—TRESPASS.**

An injunction will lie to protect the owner of an easement in its enjoyment, and, conversely, an injunction will not lie in favor of one who disturbed or interfered with the owner's enjoyment of his easement in order to secure to the former the fruits of his trespass.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 134–137; Dec. Dig. § 61;* Injunction, Cent. Dig. § 8; Dec. Dig. § 9.*]

**8. RAILROADS (§ 73*)—EXTENT OF RIGHT OF WAY—EASEMENTS.**

The grant of an easement for right of way for a railroad carries with it by implication all such incidental rights as are necessary to the enjoyment of the grant having reference to the character of the use, including the right to the exclusive possession, occupancy, and control of the right of way, and the right to remove everything placed or growing thereon which the grantee may deem necessary to remove to insure the safe operation of its road, even as against the owner of the fee.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 179–182; Dec. Dig. § 73.*]

**4. RAILROADS (§ 73*)—EXTENT OF RIGHT OF WAY—EASEMENTS.**

The owner of land over which a railroad company has acquired a right of way, either by grant or by condemnation, had not the right to construct a levee upon such right of way and join it to the railroad embankment for the protection of his land from the overflow of a river in times of flood, against the objections of the railroad company, when the effect of such levee is to overflow the tracks of the railroad and endanger trains thereon.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 73.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

In Equity. Suit by R. R. Wright and E. J. Wilson against the St. Louis Southwestern Railway Company. Decree for defendant.

On the 16th of March, 1909, complainants filed the bill in this case in the Miller chancery court, in Arkansas. The day previous thereto the bill was presented to the chancellor of that district, and a restraining order was granted, in conformity to the prayer of the bill. On the 8th of April, 1909, which was in apt time, the defendant railway company filed its petition and bond for removal with the clerk of that court, and the same was removed into the Circuit Court of the United States for the Texarkana Division of the Western District of Arkansas. It appears from the record that the complainants, Wright and Wilson, are residents and citizens of Miller county, Ark., and the defendant railroad company a Missouri corporation and a citizen of that state. On the 17th of August, 1909, after leave had, defendant filed a cross-bill. The cross-bill is entitled precisely the same as the original bill. The cross-bill sets out, a little more fully, specifically, and definitely, the same facts which are stated in the original bill; it makes no one a party defendant, prays for no process, and prays that the plaintiffs be restrained from building another levee across their right of way on the Falls plantation, and be required to remove from its right of way the two levees built by them, as stated in the bill, and tear down and remove the levee on their own land, which extends from Red river southerly to the right of way of the defendant, and for judgment for costs, and for all other and further proper relief. To this cross-bill the complainants interposed a demurrer, and the final submission of the case was had on the bill, answer, replication to the answer, cross-bill, demurrer to the cross-bill, and proofs.

Henry Moore, Jr., for complainants.
Gaughan & Sifford, for defendant.

ROGERS, District Judge (after stating the facts as above). To a cross-bill which so flagrantly disregards the established procedure on the equity side of the federal court, a demurrer is an improper remedy. A motion to strike should have been filed; and the court will treat the demurrer in this case as a motion to strike, and will order the cross-bill stricken from the files. In the case of Washington Railroad v. Bradley, 10 Wall. 299, 19 L. Ed. 894, the synopsis of the opinion is as follows:

"A petition by way of cross-bill which makes nobody defendant, which prays for no process, and under which no process is issued, is a nullity. A decree on such a bill, praying the reverse of what the original bill prayed, is fatally erroneous. Nor will the fact that objection was not made cure a combination of errors so large and so grave as above indicated."

That case is on all fours with the case at bar. This will leave the case to be determined upon the bill, answer, replication, and the evidence.

I assume that very few cases so important and involving such far-reaching consequences are submitted to a court of equity on pleadings so indefinite, vague, and unintelligible as those in this case. This is especially true of the bill, which must have been drawn in great haste and without the pleader being in possession of the necessary facts. The land through which the railroad embankment and the levees in controversy run is not even described, except as the "Falls plantation in Miller county, Arkansas." The deeds, for instance, under which the parties held, admitted without objection, do not even refer to the Falls plantation; but, the parties having treated the deeds as properly

describing the land, and having made no controversy about the identity, I shall, accordingly, so treat them. The pleader should have redrafted the bill, and the court should have required it; but, the defendant took no exceptions to it, and, having answered, the issues were made up, the proof taken, and the case submitted before the attention of the court was called to the skeleton character of the bill. From the whole record the following ultimate facts may be finally adduced: The defendant acquired its right of way through the land in controversy, called in the bill the Falls plantation, by deed anterior in time to their purchase by complainants. It is conceded, however, that such title as the parties have emanates from the same source; the complainants holding the fee and the defendant the easement. The easement acquired by the defendant gave it the same right, as if it had acquired the easement by the exercise of the right of eminent domain under the statutes of Arkansas, and no more. At the Falls plantation the railroad runs in an easterly and westerly direction, and, for convenience, it may be said to run east and west, though the defendant's witnesses (railroad men) constantly speak of it as running north and south, because the schedules of the road so designate it, thus confusing the record. On the north side of the railroad, Red river makes a long sharp bend, and approaches from the north within about 600 yards of the railroad, and then turns in a northeasterly direction for a long sweep, and then again turns sharply back south, making a bend in all of about 8 miles, to Garland City, where the railroad crosses the river. At the first bend referred to a levee had been built along the south bank of the river about 2 feet higher than the railroad track which is near thereto and on the same side of the river. The levee in controversy runs north and south, and connects the Red river levee with the railroad dump, and is now about as high as the railroad dump at the point of junction, and higher than the railroad dump east toward Garland City. That levee is known and will hereafter be spoken of as the Wright & Wilson levee. It was constructed across the land of Wright and Wilson, and up to and across the railroad right of way, and joined on to the railroad dump or embankment over the protest of the railroad. From the junction of the Wright & Wilson levee with the Red river levee the latter extends a considerable distance up the river, but it extends only a short distance from said junction down the river. Overflows have occurred in the past by the Red river levee breaking, up the river from the point of the junction of the two levees, and also by overflowing the bank east of and near to the point of junction of the two levees. West, and up the river from the Wright & Wilson levee, the Falls plantation lies, a part of it on each side of the railroad, and easterly and down the river in the river bend is found a large scope of country, about 1,500 acres, a part in cultivation and a part in a state of nature, all subject to overflow, and on the southeast edge of which, and on rising ground and adjacent to the railroad, is Garland City. On the other or south side of the railroad, the high ground, not subject to overflow, at a point some 600 feet east of the junction of the Wright & Wilson levee with the railroad dump, runs down within 105 yards of the railroad, and Wright and Wilson built another levee on that side, connecting the point of high ground near-

est to the railroad with the railroad dump. There is a cypress swamp —a sort of lake—lying east of the Wright & Wilson levee and between the levee and Garland City, the end of which extends to the south side of the railroad. Where the railroad crosses it, a trestle is provided, for the overflow water when the lake rises to pass through to the south side and run off by natural courses. West of both levees about 1,200 feet there is another trestle, and further west two others, provided for the same purpose. Before the Wright & Wilson levees were constructed, if a break occurred in the Red river levee above the point of junction where the Wright & Wilson levee is now located, the overflow water would pass through towards Garland City and go back into Red river, and also go through the west railroad trestles, and find its way to and over the low land, and thence, by natural courses, run off. This was always the result to a greater or less extent, depending on the condition of the water. The same results followed, if the Red River levee above the junction of the Wright & Wilson levee withstood the high water, and the overflow from Red river occurred east of the point of junction of the Wright & Wilson levee; so that the Wright & Wilson levees and the railroad embankment to which they were joined form a dam, and backs water up as high as the levees against the defendants' railroad dump. At present, if the Red river levee breaks west of the Wright & Wilson levee, the overflow is forced to go through the west trestles and on the low land, but cannot get into Red river in the direction of Garland City, and as long as the water is up must stand against both the Wright & Wilson levees and the railroad dump. If the overflow comes from a point east of the junction of the Wright & Wilson levee, it banks up against the railroad dump and the Wright & Wilson levees, and, if the overflow should be high enough, will back up as high as the bottom of the railroad ties at the point of junction, and run over a large part of the railroad track lying between the Wright & Wilson levees and Garland City, and cannot get through and run out over the low lands west as was the case before the Wright & Wilson levees were constructed. During the overflows in the spring of 1908 when the Wright & Wilson levees were not higher than a foot below the bottom of the railroad ties at the point of junction, one levee broke and relieved the railroad, which was already at that time endangered, the overflow water passing west over the Falls plantation and through the trestles to the low lands west and south. In 1908, the Wright & Wilson levee backed the water up until it was even with the top of the railroad embankment at points between the levees and Garland City, before the levee gave way and relieved the railroad. Since then the Wright & Wilson levee has been raised up about even with the top of the railroad dump at the point of junction, and it is fair to assume if the water should hereafter reach the top of the Wright & Wilson levee, as now constructed, the railroad tracks between the railroad and Garland City would nearly all be under water.

It would be unprofitable for me to review the evidence. I have examined it with care and with a feeling of the deepest responsibility. It is enough to say that while, as is usual in such cases, the experts do not agree, and there are some conflicts in their testimony, I do not think them material. I am satisfied that the Wright & Wilson levee

endangers the safe operation of the defendant railroad in high water. If the injunction is dissolved, it means the demolition of the Wright & Wilson levee, and the destruction of the Falls plantation until some other relief from overflows of Red River is provided; if it is not dissolved, the travel and traffic on defendant's railroad must be endangered during the high water. The question presented, therefore, is whether the temporary restraining order should be made permanent, or whether it should be dissolved. The correct determination of this question involves the recognition of certain elementary principles and their proper application to the state of facts presented by the record. "It is well settled that an injunction will lie to protect the owner of an easement in its enjoyment." 14 Cyc. 1216. The converse of that proposition must be true; i. e., that an injunction will not lie in favor of one who has disturbed or interfered with the owner's enjoyment of his easement, in order to secure to the former the fruits of his trespass. 22 Cyc., 817, and cases cited in footnotes. The correct application of the principles stated to the facts in this case renders it necessary for us to examine the nature of the easement involved in a railroad right of way; and, it must be said, in passing, that such an easement must, of necessity, be very different from an easement as to streets, alleys, and public highways and the like. On this precise point the well-considered and admirable opinion rendered by District Judge Baker in Cairo, V. & C. Ry. Co. v. Brevoort (C. C.) 62 Fed. 129, 25 L. R. A. 527, states the correct rule. He says:

"The complainant acquired an easement in the land, whose nature and extent are such as is necessary for the purpose of maintaining and operating its railway. The estate of the complainant is the dominant, and that of the defendant the servient. Davidson v. Nicholson, 59 Ind. 411; Robinson v. Thrailkill, 110 Ind. 117, 10 N. E. 647. The grant of an easement conveys all such incidental rights as are necessary to the enjoyment of the thing granted. The use to which an easement is devoted, or for which it is created, determines its character, and, to the extent that the use is necessary to carry out the purpose of the grant, the rights of the owner of the easement are paramount. An easement granted to a railway is essentially different from any other. The nature of railway service requires exclusive occupancy. A railroad company is held to the highest degree of care, and the exercise of this care necessarily requires that it should have complete dominion over its right of way. It is bound to prevent obstructions from being placed on its tracks, and is required to keep them fenced in, and free from rubbish or other combustible materials. The duties of a railway company are due to the public as well as to individuals, and these duties it must perform at its peril. The rules which apply to the use of streets and highways fail, when applied to railroads, because the necessities of their use are different. The railroad must have the exclusive possession and control of the land within the lines of its location, and the right to remove everything placed or growing thereon, which it may deem necessary to remove to insure the safe management of its road. Hayden v. Skillings [78] Me. [413] 6 Atl. 830; Brainard v. Clapp, 10 Cush. [Mass.] 10 [57 Am. Dec. 74]; Hazen v. Railroad Co., 2 Gray [Mass.] 577; Locks & Canals v. Nashua & L. R. Co., 104 Mass. 11 [6 Am. Rep. 181]; Jackson v. Railroad Co., 25 Vt. 150 [60 Am. Dec. 246]; Railroad Co. v. Holton, 32 Vt. 43; Atlantic & P. Tel. Co. v. Chicago, R. I. & P. Co., 6 Biss. 158, Fed. Cas. No. 632."

In Jackson v. Rutland & B. R. Co., 25 Vt. 159 (60 Am. Dec. 246), the court said:

"The right of a railway company to the exclusive possession of the land taken for the purposes of their road differs very essentially from that of the

public in the land taken for a common highway. The railway company must, from the very nature of their operations, in order to the security of their passengers, workmen, and the enjoyment of the road, have the right at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy, by the former owners, in any mode and for any purpose. Any other view of the subject must lead to the imminent peril of life and property, and ultimately to the most glaring absurdities."

In Conn. & Pass. R. R. Co. v. Holton, 32 Vt. 44, the court said:

"Although the right which a railroad company acquires to land taken under their charter is said to be merely an easement, yet the nature of their business, their obligations to the community and the public safety, require that their possession of the land so taken should be absolute and exclusive against the adjacent landowner, so far as to secure fully every purpose for which the railroad is made and used. The possession of the railroad company cannot be limited to any point of occupation less absolute and exclusive than this: that the corporation may do any act upon the land conducive to those uses for which their charter was granted, and may exclude the landowner from taking any possession or doing any act upon the land which may in the least degree tend to jeopardize the safe transportation of passengers and freight upon the road, or which may in any way interfere with or embarrass their use of the road and land for any of the purposes which the railroad is intended to accomplish. This possession in Massachusetts has been said to be 'practically exclusive'; [Hazen v. Boston & M. R. Co.] 2 Gray [Mass.] 574. In Jackson v. R. & B. R. R. Co., 25 Vt. 159 [60 Am. Dec. 246], though the precise point was not under consideration, Chief Justice Redfield says: 'The railroad company must have the right at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy by the former owners in any mode and for any purpose.' Without stopping to inquire whether a possible case may not exist where the landowner might enter to obtain mines or minerals, or to take herbage or other vegetable growth, it is obvious that the possession of the railroad company must ordinarily and practically be absolute and exclusive. Hence any entry by the landowner or any act done by him upon the land which tends in the least to impair the structure of the road; to endanger the running of trains, to lessen the safety or comfort of passengers, or generally to embarrass the use of the road for the purpose for which it was built, or the power of the railroad company to keep in repair, must be deemed wrongful."

Again, the rule is that:

"Where acts of trespass are continuous or constantly recurring whereby, if permitted to continue, irreparable injury may result, as where the continuous wrongful invasion of plaintiff's right might ripen into a prescriptive right, an injunction will lie to restrain such trespasses, both on the ground that the remedy at law by suits for damages is inadequate, and to prevent a repetition or multiplicity of such suits."

We have, then, this character of case to consider: The complainants confessedly have entered upon and constructed a levee on the right of way of defendant company over its protest, which levee defendant cut as a trespass on its easement as dangerous to the operation of its trains. Thereupon plaintiffs rebuilt the levee, and under the protection of a restraining order built it higher than it was before it was cut, and which complainants now seek to protect by permanent injunction. As stated, the proof satisfies the court that in the spring of 1908, when the Wright & Wilson levee gave way and relieved the dangerous condition of the defendant's road, the water stood on the defendant's railroad embankment, which was, in effect, a part of the levee, at a point about 1 foot below the bottom of its ties, and for 1,200 or 1,500 feet between Garland City and the levee the back water

had risen practically to the top of the embankment, and at places higher than the bottom of the ties, where it remained till the water ran over the Wright & Wilson levee and relieved the situation; that thereafter the Wright & Wilson levee was rebuilt and raised practically as high as the railroad embankment at the point of junction, and higher than a considerable part of the railroad track towards Garland City. No flood has occurred since the Wright & Wilson levee was thus constructed. Had such been the situation when the overflow came in the spring of 1908 the railroad embankment at the point of junction would not only have been in imminent danger, but all, or nearly all, of the track between the point of junction and Garland City would have been under water; provided, of course, the overflow had been sufficient. Whatever may be the rule of law governing an owner in the construction of levees to protect his holdings from surface water, which in some jurisdictions is held to be a common enemy which any owner may fight as he best can in order to protect himself, and about which there is much confusion in the authorities, it is nevertheless clear that the rule as to flood waters, which are in no proper legal sense surface waters, is different. That subject, however, is fully discussed in Cairo, V. & C. Ry. v. Brevoort, supra, and the Indiana cases relied upon for a contrary doctrine differentiated and repudiated. The rule, the court declares, from a review of the authorities, is thus stated:

"With reasonably near approximation to accuracy, it may be laid down as a general rule that all waters of a river, which form one body, when flowing within the boundaries within which they have been immemorially accustomed to flow, in times of ordinary floods, constitute waters of the river, and are not surface waters."

In the case of Burwell v. Hobson, 12 Grat. (Vt.) 322, 65 Am. Dec. 247, while discussing the rule governing riparian owners upon opposite sides of a stream, as to obstructing flood waters, it is held:

"But he contended that it is confined in its application to the ordinary course of the stream, and that a riparian proprietor may lawfully protect his property from floods by erecting a dike or other obstruction, though its necessary effect may be to turn the superabundant water on the land of his neighbor. Such a distinction between the ordinary and extraordinary flow of a stream is not laid down or recognized by any elementary writer, or in any adjudged case, so far as I have seen. The utmost extent to which the authorities go in that direction is that a riparian proprietor may erect any work in order to prevent his land being overflowed by any change in the natural flow of the stream, and to prevent its old course from being altered. Ang. Water Courses, § 333. But he has no right to build anything which, in times of ordinary flood, will throw the waters on the grounds of another proprietor, so as to overflow and injure them. If, in the case of such an obstruction, it appears that the injury rose from causes which might have been foreseen, such as ordinary freshets, he is liable for the damage. Id. 349. That the supposed distinction does not exist was expressly decided in Rex v. Trafford, 1 Barn. & Adol. 874."

If the rule as to obstructing flood waters is there correctly stated, it would seem the principle is equally applicable to the conditions of the case at bar. Let us see. The Wright & Wilson levee is joined on to the defendant railroad company's dump or embankment. Suppose it had been done by the consent of the railroad company! The rail-

road company would, perhaps, be estopped to complain of unexpected and unforeseen injuries to its own properties; but would it be relieved of damages for injuries to those of its patrons who suffered either in person or property by reason of accident resulting from high waters thus produced; or, would it be relieved of damages to those whose lands were overflowed or injured by the back waters caused by the combined effects of the railroad dump and the Wright & Wilson levees? Without deciding those questions, not presented by this record, it may be well to say that Farnham on Waters and Water Courses says (volume 2, p. 814):

"So far as parties contributing to the injury act in the same right, they may be joined as defendants in an action. Thus, two riparian proprietors of opposite sides of a creek, each of whom constructs a dam from an island in midstream to his own shore, the joint effect of which is to cause an overflow of lands of an upper riparian owner, are properly joined as defendants in trespass on the case; and a verdict against one and excusing the other will be sustained. * * * In case the dam which causes the injury is owned jointly by several owners, one may be sued separately for the injury inflicted by it, unless each is responsible for the whole injury."

Whatever may be the rule governing a railroad in a case like the one at bar with reference to adjoining property owners, it is clear that it cannot escape liability to the patrons of the road, both as regards traffic and travel, whether it has either acquiesced in a trespass upon its property which produces the loss or injury to its patrons, or whether it willingly joined another in the act which resulted in the loss or injury to its patrons; and this illustrates what was said in the cases above referred to in relation to the care which railroad companies owe to all their patrons; and, second, the necessity that railroads should have exclusive dominion over their rights of way.

With a strong inclination, if possible, to reach a result in this case which would protect both the railroad company and the property owned by the complainants, I have been reluctantly driven by the facts and the authorities to the conclusion that the restraining order in this case was improvidently issued, and that it must be dissolved, and the bill dismissed at the costs of the complainants. And it is so ordered.