JAMES BRANIN *v*. THE CONNECTICUT AND PASSUMPSIC RIVERS RAILROAD COMPANY.

*Railroads. Constitutional law.*

Section 60 of the General Railroad Law, (\*Comp. Stat. chap 26, p. 203) which provides for the liabilty of railroad corporations to day laborers employed by contractors in constructing their roads, is not unconstitutional as impairing the obligation of contracts.

Under this section a railroad corporation is liable to day laborers employed by sub-contractors, as well as by those who contract directly with the corporation.

Such a day laborer may, under this section, recover of the corporation, not only for his own personal labor, but also for the use of his horse and cart with which he worked in the construction of the railroad.

ASSUMPSIT. The first count of the declaration was as follows : "And now the said James Branin declares against the defendants in a plea of the case, for that at Burke, in said county, on the 10th day of October, 1856, John D. Fife and Erastus A. Wadleigh, partners under the firm of Fife & Wadleigh at said Burke, contractors on the extension of the defendants' railroad from St. Johnsbury to Barton, being indebted to the plaintiff in the sum of one hundred dollars for services, work and labor done and performed at the special instance and request of the said Fife & Wadleigh, contractors as aforesaid, by the plaintiff as a day

* This section is recited at length in the opinion of the court in this case.

Branin *v.* The Conn. and Pass. Rivers Railroad Company.

laborer in making said extension of the defendants' railroad, to wit: at Burke aforesaid and Sutton in said county, within forty days then next preceding said tenth day of October, A. D. 1856, in consideration thereof, the said Fife & Wadleigh then and there promised the plaintiff to pay him the same sum on demand, which though often demanded of the said Fife & Wadleigh, they have not paid, but neglect and refuse to pay the same, and. particularly on said 10th day of October, 1856; whereupon at Burke, aforesaid, afterwards on said 10th day of October, 1856, the plaintiff gave notice thereof to the defendants, for whom said labor was performed, of the performance of said labor and of his holding said claim therefor, and that the same was unpaid, and that he should hold the defendants liable to pay the same, by a notice in writing then and there delivered to one Asa Howe, the engineer in charge of the section on which said labor was performed, whereupon the defendants in consideration of the premises then and there promised the plaintiff to pay him the same sum on demand. Yet, though often demanded, the defendants have not paid the same nor any part thereof, but neglect and refuse to pay the same."

The declaration also contained the common counts. The case was tried by the court at the June Term, 1858, of the Caledonia County Court,—POLAND, J., presiding.

From the evidence before them, the county court found that the defendants contracted with A. P. Balch, to build their railroad from St. Johnsbury to Barton, and Balch.subsequently contracted with Fife & Wadleigh to build that part of the road from West Burke to Barton.

The plaintiff was employed by Fife & Wadleigh as a day laborer, with his horse and cart, to work upon the road, and as such performed the amount of labor for which he seeks to recover. One Adams was the chief engineer of the company, having the general oversight of the whole road, and one Howe was an under engineer, having the particular charge of the work on several sections of the road, including that on which the plaintiff worked. The estimates of labor done on these sections were made by Howe, and were by him returned to the chief engineer at the general office in Lyndon.

Early in October, 1856, Fife & Wadleigh failed, and on the 11th of October, 1856, the plaintiff gave Howe notice in writing that he should rely upon the defendants for the amount due him for payment of the work of himself, horse and cart. The whole of the plaintiff's work was done within forty days prior to this notice. Upon these facts the court rendered judgment for the plaintiff for the full amount of his claim, to which the defendants excepted.

*T. Bartlett,* for the defendants.

1. The statute upon which the plaintiff relies, (Comp. Stat. chap. 26, sec. 60, p. 203) refers only to the day laborers employed by the *contractors with the corporation,* and not to those employed by sub-contractors. This seems clear, for the act directs the corporation to require security from the contractors that their day laborers shall be paid. It seems to contemplate that they must bear the relation of contractor and employee to the company. For the company have no power or control over the sub-contractors, and perhaps have no knowledge of their existence, and cannot demand security of them, for they are not *contractors as regards the company,* and there is no privity between them and the corporation.

2. If the plaintiff is entitled to recover at all, he can recover only for his personal manual labor, as day laborer, and not for the use of his horse or cart. The policy of the statute was merely to secure to the poor *day laborer* of the contractor a compensation for his personal services, and to leave those furnishing teams, carts, materials and other means, as the law left them before the passage of the act. Besides the plaintiff *declared* only for day labor, and not for the use of his horse and cart, and therefore he can not recover for the latter.

3. The act is unconstitutional. The charter of the company was granted as it now stands in 1845, and in it the legislature reserved no power to control, alter or amend it. It also provides that it shall be construed favorably and beneficially for all the purposes for which it was enacted. The company organized and had completed a large part of their road before the passage of the statute in question. The charter gave the corporation the

right to their property, and the funds and earnings of their road. The act in question interferes with and controls those rights by creating an obligation where none existed.    It takes the property of the corporation without their consent to pay debts they never contracted, and it thus impairs the obligation of the contract of the State with the corporations, to maintain inviolate forever the rights guaranteed by the charter.* *Fletcher* v. *Peck*, 6 Cranch 187 ; *Terrett* v. *Taylor*, 9 Cranch 52; *Dartmouth College* v. *Woodward*, 4 Wheaton 641, 651.

*George C. & George W. Cahoon*, for the plaintiff.

1. The plaintiff's claim comes within both the policy and the letter of the statute.    The statute was passed not only to protect the poor day laborer from loss by the failure or dishonesty of contractors, but also to protect the public from the pauperism necessarily consequent upon the loss of the laborer's wages.    The first clause of the statute in question provides a means by which the company can fully indemnify themselves against any loss occasioned by their liability under the second clause.

The labor performed by the plaintiff with his horse and cart is as much within the policy and letter of the statute as his own personal manual labor.    The contract for his labor and that of his horse and cart seems to have been an entire one, and it is impossible to divide the compensation due him.

2. The statute in question is fully within the power of the legislature to pass, and is not unconstitutional.    It is of the nature of a police regulation to prevent needless injury to persons and property, and also to prevent pauperism.    *Waldron* v. *Rens. and Saratoga Railroad Co.*, 8 Barbour 390 ; *Nelson* v. *Vt. Central R. R. Co.*, 26 Vt. 717 ; *Thorpe* v. *Rut. and Bur. R. R. Co.*, 27 Vt. 144, 156 ; *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 629 ; 2 Parsons on Contracts 511 ; Redfield on Railways 549, 559, 560 ; *Boston, Concord and Montreal R. R. Co.* v. *State*, 32 N. H. 215 ; *Peters* v. *Iron Mountain R. R. Co.*, 23 Missouri 107, 111 ; *Galena and Chicago R. R. Co.* v. *Loomis*, 13 Ill. 548 ; *State* v. *Bosworth*, 13 Vt. 402 ; *Providence Bank* v. *Billings*, 14 Peters 514 ; Comp. Stat. p. 31, art. 5.

---

* See the remarks of BARRETT, J., upon a kindred question, in the opinion of the court in *Atkins & Co.* v. *Randolph, post.*—REPORTER.

ALDIS, J. The general railroad act, sec. 60, provides that "every railroad company in this State shall require sufficient security from the contractors for the payment of all labor performed in constructing the road of such company by persons in their employ; and such company shall be liable to the day laborers employed by the contractors, for labor actually performed on their road, but such liability shall not exist unless the person having such claim shall in writing, within forty days after the performance of the labor, notify the engineer in charge of the section on which the labor was performed, that he has not been paid by the contractors."

The railroad company contracted with A. P. Balch to build the road. Balch contracted with Fife & Wadleigh to build a part of it. Fife & Wadleigh hired the plaintiff as a day laborer to work with his horse and cart upon the road. They failed. The plaintiff sued the railroad company under the section above recited, for his work done for Fife & Wadleigh. The railroad company objects:

I. That the act is unconstitutional as "impairing the obligation of contracts."

The clause in the U. S. Constitution: "No State shall pass any law impairing the obligation of contracts," is held to prohibit the taking away or impairing any of the essential franchises of a corporation.

These franchises exist only when they are expressly conferred by charter, or when they are implied as being necessary to the existence or beneficial operation of the corporation. The principle, as expressed by Ch. J. MARSHALL, in the Dartmouth College case, would perhaps restrict the implying of corporate franchises to still narrower limits. His language is: "A corporation possesses only those properties which the charter of its creation confers upon it, either expressly, or as *incidental to its very existence.*"

In determining upon the existence and extent of these essential franchises thus put beyond legislative control, and especially in cases where they are raised by implication, the rule of construction is strict, in favor of the public and against the corporation. If the power is claimed to be an express one, it must be clearly

given by the charter.  If claimed as an implied one, the necessity which gives rise to it must be strong and unquestionable.

The franchises essential to the existence and just operation of this company are set forth in its charter.  They are to be a corporation, to build a road, to transport freight and passengers on it, and to collect tolls.  These are its chief franchises and show the main purposes for which it was created.  To secure these great objects of the charter, other powers are expressly granted. The use and enjoyment of these privileges are regulated by many provisions both of the charter and the general railroad act.  It is not claimed that this company is exempt from the operation of this statute by any express provision of its charter.  The only essential franchise, with which the statute can be supposed to come in conflict, is the right to build a road.  The act substantially provides that if the company employs contractors to build its road, it must be liable to the day laborers employed by the contractors for labor actually performed on the road, within forty days before notice in writing to the engineer, of such claim of the laborer.  Does this provision impair the right to build the road?  Is the corporation deprived of any necessary means of building the road by being subjected to the liabilities of this law ?

II.  It does not appear but that the railroad company could build their road by the action of their own officers and agents, the use of their own funds and the direct employment of laborers, without the intervention of contractors.  Clearly this could be done. It is not manifest that the letting and sub-letting of the construction of the road to contractors and sub-contractors is either necessary or even profitable.  If the company can build the road without the intervention of contractors, the statute can not be said to conflict with the privilege of building the road.  It would be simply inoperative upon the power granted for that purpose. In some of the States, where great public works have been undertaken, the law has forbidden the sub-letting of contracts, in order to prevent among others the evils which, in this State, this statute was intended to remedy.  The power to let out the construction of the road to contractors is a power not expressed in the charter, but implied from the ordinary modes of transacting business,

and the supposed necessities or convenience of the company. If the existence of such a right may be reasonably implied, still its exercise can not be considered as being put beyond legislative control.

III. Even if the intervention of contractors was a necessary means to the building of the road, we can not consider that the act would be such an obstacle to the making of contracts as would hinder the company in the successful construction of their work. Both the company and the contractors must expect to pay the day laborers. The fund from which they are to be paid comes from the corporation. The supervisory power so amply retained by such corporations in ordinary railroad contracts for construction, and their rights, as usually specified, to retain funds to await the final completion of the work by contractors, show that provisions similar to those required by the statute would not have been held objectionable in the making of such contracts. On the contrary, when incorporated in such contracts they would doubtless be decidedly beneficial in the successful prosecution of such works. It is needless to say, that as the statute only looks to the future, to regulate only the liability of the railroad companies upon works contracted for after the passage of the act, the railroad companies can not, without their own neglect, be subjected to pecuniary loss. They can take " sufficient security" as the statute contemplates; they can retain funds; they can provide for the payment of the laborers under such supervision and subject to such regulations as will not fail to apply their funds to that object.

If a partnership of capitalists were to undertake the building of a railroad without corporate powers, who could doubt that legislative control over them would be held to extend to the regulation, by general laws, of their relations and liabilities to all in their employment. The right to exercise the power in the case of natural persons would not be questioned. Corporations are subject to precisely the same legislative control as natural persons, except where they are exempt by *express* provisions of their charters. The statutory enactment in regard to mechanics' liens is in substance the application of the principle as between natural persons. It creates a security for indebtedness by a general

law and without the agreement of the parties interested. In the construction of our statute that lien has been confined to the first contractor, not because the State had not the constitutional power, but because it did not intend, to extend the lien further.

The objection to making the company liable for work done by the laborers is, that the company contract only with the contractors, not with the laborers; and that to hold them liable to the laborers, is to bind them by contracts to which they have not assented. In weighing this objection, it is to be considered, 1st, that the statute does not bind the corporation to past contracts. It applies only to contracts made and work performed after the passage of the act. 2d, that the legislature, by the act, does not make any contract for the corporation, or authorize any one to bind the corporation without its assent. It merely imposes a restriction in regard to its making contracts for building the road. It establishes by general law, a privity and liability between the corporation and the laborers, which the corporation is *bound to have in view in making contracts*, which does not in the least impair their power to build their road, and in regard to which they can secure themselves from loss. The exercise of this power, so far as it is intended as a security to the laborer, grows out of the peculiar nature of these railroad enterprises, of the employment of large numbers of poor and ignorant laborers, generally foreigners, of their liability to be deprived of the means of subsistence by the failure of contractors, and their ignorance and inability to secure themselves. It would seem to be clearly within the appropriate duties of government to protect those who are so little able to protect themselves, and by a general law, to provide securities for them according to the equity of their claims and the necessities of their situation. It is upon this principle, that domestic servants and others in relations of dependence and confidence, are often made preferred creditors in statutes which provide for distributing the property of insolvents. If we were to regard the law, therefore, merely as imposing a liability for the security of laborers, we should hold it constitutional.

But when we consider the circumstances which gave rise to the act, and the mischiefs it was intended to prevent, we can have no

doubt that its enactment was clearly within the power of the legislature.

The power of the legislature to pass all laws required by the public welfare, and to subject corporations like natural persons to their operation is unquestionable. This power is sometimes called the general police power of the State. The right and duty of the legislature to exercise it, and its extent and application, have recently been so fully considered and vindicated in the case of *Thorpe* v. *The Rutland and Burlington Railroad Company*, 27 Vt. 140, that it is needless to discuss the subject at this time. It is sufficient to say, that laws required by the public good are constitutional, though they may impose new obligations and restrictions, and may materially increase the expenses and diminish the profits of corporations; 27 Vt. 140 ; 8 Barbour 358, 390; Redfield on Railways, p. 537. The object of such laws is the public welfare. Their effects upon the pecuniary interests of corporations are merely incidental, and do not give character to them, or determine their validity.

Laws to prevent pauperism and breaches of the peace clearly come within the range of this legislative power. In applying this doctrine to the present question, we should consider the causes in which this statute had its origin.

Large numbers of poor day laborers, generally foreigners, were employed in building the railroads. By the failure of contractors they were often deprived of their earnings, of employment and of all means of subsistence for themselves and their families. The towns along the lines of the railroads became chargeable for their support as paupers, and thus were subjected to heavy burdens. Applications were made to the legislature to modify the poor laws so that the State should bear these unusual expenses. Thus, the prevention of the pauperism, growing out of the prosecution of these railroad enterprises, became a subject of legislative action. Nor was pauperism the only evil. The laborers, feeling that they had been wronged, ignorant of all means of redress, sought to retaliate for their wrongs upon the contractors, the railroad companies, and even upon the community. Riots and breaches of the peace ensued, attended with danger to

life and property. These evils seemed to flow directly from the necessary employment of such laborers upon these great works. The remedy was simple, to secure to the laborers pay for their work. Hence the enactment of this statute. It was made to prevent pauperism and breaches of the peace, evils which no person, natural or artificial, can by contract acquire a right to inflict upon the community without restraint from legislative control. And where, as in this case, the exercise of this control subjects the corporations to no pecuniary expense, and rather aids, than hinders, the prosecution of their enterprises and the enjoyment of their privileges, there seems to be no ground whatever, for questioning its legality. Nor is the question entirely without precedent. In New York a statute similar to ours exists, has been brought before their courts, and its constitutionality has not been questioned; *Kent* v. *N. Y. Central R. R. Co.*, 2 Kern. 628.

In Missouri, upon a like statute, the question has arisen in a case where the charter *expressly* exempted the corporation from legislative control; yet the statute was sustained. The court say, " The corporation is not exempted from obedience to the general law of the land, by the exemption of its charter from legislative alteration. Here is no attempt to deprive them of their property, or to encroach upon their chartered privileges;" *Peters* v. *The St. L. and Iron Mountain R. R. Co.*, 23 Missouri 107. The doctrine of these cases is recognised in Redfield on Railways, 559, and in Pearce on Railroads, 40.

IV. Holding the law to be constitutional, the next inquiry is whether the statute applies to day laborers employed by contractors, who contract with other contractors, and not directly with the company, and who are sometimes called sub-contractors. In determining this, the rules applicable to the interpretation of statutes, and of which the great object is, to ascertain the real intent of the legislature, must be regarded.

The word " contractors " clearly includes all who contract for the construction of the road, whether they contract directly with the company, or with others who have so contracted. The general term " contractors " includes all sub-contractors. In popular parlance, Fife & Wadleigh would be called contractors, as much as Balch. It would be only when occasion for the distinction

should arise, that the term "sub-contractor" would be used.

The intent of the legislature is apparent from the whole tenor of the act, as well as from its language. When it speaks of day laborers employed by contractors, does it mean to include one set of hands employed on one section by a contractor with the company, and exclude another set on an adjoining section, because employed by one who may be called a sub-contractor? No one can believe that this was the real intent of the legislature. Consider the mischievous consequences of a contrary construction, that the whole beneficial operation of the statute might be frustrated, and the law completely and easily evaded by the company's contracting with some one who should let out the whole work to sub-contractors. Nor can we doubt the intent of the statute when we consider the well known mischiefs which gave rise to the law, and which it was intended to remedy.

If it should be urged that the company is to take sufficient security from the contractors, and that this tends to show that only contractors with the company were intended, the reply is, 1st, the act does not say contractors with the company, but only contractors, generally: 2d, the company having the power to frame all their contracts, so as perfectly to comply with the statute and secure themselves, can provide that no person, contractor or sub-contractor, shall be allowed to enter upon the construction of the work till he has given the company the sufficient security required by the act: 3d, the company may, if they see fit, omit the taking of the security. The statute is merely directory; there is no penalty for the omission. Their liability under the second clause of the statute, "the company shall be liable to the day laborers," etc., is a direct and positive liability to the day laborers, and does not depend upon their compliance with the first clause, in taking the security.

The letter of the statute, its spirit, the mischiefs it was intended to remedy, and the bad consequences of a contrary interpretation, all clearly show that it was intended to include all who by contract, whether directly with the corporation or with others under it, employed day laborers in the construction of the road.

The case of *McClusky* v. *Cromwell*, 1 Kern. 593, has been cited as authority for a contrary construction. That was a suit on a

bond given by Cromwell and another as surety, to the State of New York, pursuant to an act to secure the payment of wages to laborers on the canals. The condition of the bond was, in the terms of their statute, " said Cromwell shall pay in full, the wages agreed to be paid to each and every laborer employed by him, or his agent, or agents, in the construction of the work." He sublet a part of the work to one Shippey, and Shippey employed laborers. The laborers, upon the failure of Shippey, pursuant to the statute, brought a suit on the bond against Cromwell. The court held, Ruggles & Edwards dissenting, that the language of the bond, " laborers *employed by him*, or his agents," etc., limited the benefits of the bond, so that laborers not employed by *him*, but by Shippey, could not have the benefit of it. The decision turns upon the words " employed by *him*." The court say " we can not strike out of the bond the words " by him, or his agent, or agents," so that it shall read " laborers employed in the construction of the work," without reference to the employer. The contract thus modified, would be entirely different from that made by the parties." So too, if it had been modified so as to read like our statute, thus : " laborers employed by contractors in the construction of the work," it would have received a very different construction. To make that case applicable to our statute, a suit should be brought by the company on a bond against one contractor, for work done by laborers for another.

But in *Kent* v. *The N. Y. Central R. R. Co.*, 2 Kern. 628, the construction of the New York statute, which is very similar to ours, was settled. The words of their act are, " as often as any contractor for the construction of any part of a railroad shall be indebted to a laborer for thirty days' labor performed in constructing the road, such laborer may give notice, etc., and thereupon the company shall be liable to pay such laborer," etc.

If the term " the contractors" in our statute, does not include " sub-contractors," then the term " any contractor," can not include any sub-contractor. Again, the New York statute says " as often as any contractor, etc., *shall be indebted to a laborer.*" How can this be unless it is a laborer " employed by the contractor ?" A critical comparison of the two statutes will show that though their forms of phraseology are different, there is nothing

16

in their language, or their context, to give to one a meaning different from the other. In the case above cited, the Court of Appeals of New York, held that the statute intended to include all laborers, whether hired by contractors or sub-contractors; that the term contractors included all sub-contractors. The case of *McCluskey* v. *Cromwell* was carefully reviewed, and shown to be inapplicable to the construction of the statute upon the grounds above indicated. The case of *Kent* v. *The N. Y. Central R. R. Co.*, being a case precisely like the one at bar, and upon a statute so like our own, and having so fully reviewed all former decisions in that State, is entitled to much weight in the decision of the present case.

It is also claimed that "the work actually performed in the construction of the road," as mentioned in the statute, can only include work done by the laborers *personally*, and not the use of their horses and carts when employed by them. We see no just ground for making so nice a distinction, and think the intent of the act was to include both.

The judgment of the county court is affirmed.