J. L. BACON ET AL. *v.* BOSTON & MAINE RAILROAD ET AL.

CENTRAL VERMONT RAILWAY COMPANY *v.* TOWN OF HARTFORD ET AL.

February Term, 1910.

Present:   ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed May 11, 1910.

*Boundaries—Monuments—Control over Courses—Grade Crossings—Abolition—Establishment of Highway—Railroads—Regulation—Powers of Public Service Commission—Constitutional Law—Police Power—Contract Obligation—Railroad Charter—Due Process of Law.*

Where the survey of a public highway between a hotel and a railroad station begins in the range of the northerly end of the hotel three rods from the northeast corner thereof, and thence extends a designated course and distance "to the track of the Central Vermont Railroad," the rule that courses and distances are governed by fixed monuments does not apply so as to extend the road to the railroad track, for the starting point of the survey is not a monument, nor is the railroad track a monument, as it could determine nothing without reference to the courses and distances.

The phrase "railroad track" is quite generally used to denote the right of way of a railroad, and often means the same as "roadway."

A statute must be reasonably interpreted with reference to the evil it was intended to remedy, and the dangers and liabilities it was intended to prevent.

Statutory proceedings and surveys by selectmen laying out a public highway, but without the recorded certificate required by P. S. 3824, that the road is open for travel, do not make the road laid out a public highway, and such a road cannot become a public highway unless it is recognized as such by some unequivocal act of the town.

On petition by railroad companies to abolish a grade crossing and apportion the expenses thereof on the ground that the crossing is a public highway, the burden is on the petitioners to prove that the crossing is a public highway, and so they are bound to produce the record of the completion and opening thereof, if they rely on the record of a highway laid out by the selectmen.

The presumption as to the performance of official duties is, generally stated, that where the regularity of an official act is dependent on some coexisting or preexisting act or fact, the doing of such act or the existence of such fact is presumed; but that rule cannot be applied so as to conflict with the rule that the existence and contents of a record must be proved by the record, in the absence of facts excusing its production, so that it cannot be presumed that the certificate of the completion and opening of a public highway was filed in the town clerk's office, as required by P. S. 3824.

The discontinuance by the selectmen of a town of an alleged public highway could not affect rights or liabilities in respect of the highway that accrued before such discontinuance, if it actually existed, nor could it be retroactive so as to operate as a recognition of a grade crossing as part of such highway, so as to affect such rights and liabilities; and hence such discontinuance by selectmen after railroads had begun a proceeding to eliminate a grade crossing in such highway, was immaterial in determining whether the road was a public highway.

A railroad company may lease part of its right of way, if it does not thereby affect its ability to discharge its public duties.

Though a railroad company may dedicate a public highway across its tracks, evidence *held* not to show such a dedication.

A dedication of a public highway must be absolute and irrevocable.

The facts that a railroad company for many years maintained planks between the rails of its track at a certain place near its passenger station, and permitted free access from a public highway to and from the passenger station across its tracks at that place, and permitted patrons of the postoffice, of the express company, and

of the telegraph company, which were close by, together with passengers, shippers, school children, and persons living near the station, to use such crossing, did not amount to a dedication of it as a public highway.

The adoption of a dedicated way as a public highway must be evidenced by acts of the proper town authorities, mere use by the public is not sufficient.

There is no such thing as a public highway that no one is bound to repair; and P. S. Ch. 194, providing for the elimination of grade crossings and the apportionment of the expense thereof between the state, the town, and the railroad, contemplates only grade crossings that are public highways.

The Public Service Commission has power to require every railroad company to discharge all its public duties, whether imposed by charter, general law, or the nature of its business; but its powers are only those of supervision and regulation and not of management and administration, and the Commission cannot, in ordering the elimination of a grade crossing by the construction of a subway as an approach to a passenger station, require the removal of a number of tracks, unless that is a necessary incident to the construction of the subway, nor can it require the construction of an underground baggage room with an elevator, in connection with such subway, unless that is a necessary incident to the subway in the circumstances.

The charter of a railroad company, giving it the power of locating and altering its tracks and of constructing a railroad according to its discretion, does not authorize it to maintain its station and surrounding tracks so near together as to menace the public safety, nor exempt it from the operation of the State's police power, although such charter was granted before the passage of the statute reserving to the Legislature the power to amend or repeal corporate charters; and the Public Service Commission may compel it to move its tracks so as to increase the platform room about its station, if public safety and convenience so requires, and that does not impair the obligation of any contract, nor take property without compensation, but is authorized under the police power.

By accepting their charters and operating their road, railroad companies undertake to carry out the purposes for which their charters were granted, and are bound to act as common carriers and

discharge all the duties incident to that relation so long as they hold their charters.

The State's police power is founded on its duty to conserve the public safety, public health, and public morals, and, as that power is an essential attribute of sovereignty, it cnanot be abrogated.

All property is held subject to the general police regulations of the State.

On appeal from an order of the Public Service Commission, the Supreme Court is not an appellate Public Service Commission, with all the power of the Commissioners.

APPEAL from an order of the Public Service Commission dated June 1, 1909, and directing the construction of a subway as an approach to the passenger station at White River Junction, the increase of the station platform, and the making of certain repairs on the station.    The opinion fully states the case.

*Young & Young* for the Boston & Maine Railroad, *C. W. Witters* and *H. H. Powers* for the Central Vermont Railway Company.

The order of the commissioners for elimination of tracks and the taking up and relaying of tracks in a different location, thus compelling railroad companies to expend a large amount of money against their will and without in any way increasing their facilities, is such a taking of property without compensation as is prohibited by the Vermont Constitution and the Constitution of the United States.    Among the many cases upon this subject the following illustrate this principle.    Taking away right to take tolls.    *Ft. Wayne etc. Co.* v. *Maumee etc. Co.,* 132 Ind. 80; *Highland Park* v. *Detroit etc. Co.,* 95 Mich. 489.    Interference by conduction of electricity.    *Cumberland etc. Co.* v. *U. El. R. R. Co.,* 93 Tenn. 492; *Central etc. Co.* v. *Wilkes-Barre etc. Co.,* 11 Pa. Co. Ct. 417; *People* v. *Otis,* 90 N. Y. 48; *Lake Shore etc. Co.* v. *Smith,* 173 U. S. 684; *Tyler* v. *Beacher,* 44 Vt. 648; *N. E. T. & S. Club* v. *Mather,* 68 Vt. 338; *Avery* v. *Vermont Electric Co.,* 75 Vt. 235.

*James G. Harvey* and *Alexander Dunnett* for John L. Bacon et al. and Town of Hartford, *John G. Sargent,* Attorney General, for the State.

HASELTON, J.   February 11, 1908, John L. Bacon, and thirteen others, freeholders of the town of Hartford, addressed a petition to the Board of Railroad Commissioners, now the Public Service Commission, Acts of 1908, No. 16, stating in general terms that they believed that the approaches to the union passenger station at the village of White River Junction in the town of Hartford were such as to endanger the public safety and requesting a hearing on the matter, and also requesting that the sufficiency of the station with respect to the convenience and accommodation of the public should be considered in the hearing.   May 18, 1908, this petition was amended so that the complaint thereof was more specific.   The amended petition set out that the station is insufficient, is improperly maintained and is not properly located for access from the Main street of the village; that it is not so arranged as to accommodate the patrons of the railroads centering there and the public having business there; that the only approach to the station is by a crossing at grade over many tracks, and that the tracks at such crossing are used by the railroad companies for the shunting and yarding of cars, so that by reason of an almost continual use of the tracks for such purposes the crossing of persons and teams is a very great source of inconvenience and danger to the patrons of the railroads and to the portion of the public who have business there, and that the use of coal in engines and the noise made by engines in hauling cars there are sources of great annoyance and inconvenience to people in the vicinity.   The amended petition prays the board to make such order as is just, proper and right as to the maintenance of a station such as is safe, convenient and proper for the use of the patrons of the railroads and for the public and to make a like order as to a change in the manner of approach to the station; that the tracks there be removed, and the shunting and yarding of cars there be abolished, and that such other changes be made in the approach to the station as shall make the crossing there reasonable and safe.   The amended petition prays generally for such an order as may be just and reasonable in the premises.

To this petition the Boston & Maine Railroad and the Central Vermont Railway Company filed their several answers, and a hearing was had in the cause.   A report was filed and an order was made in September, 1908.   The order provided for the con-

struction of two subways under the tracks, eight in number, of the Central Vermont Railway Company westerly of the station. One of these was to be a footway ten feet high and twelve feet wide, and the other a driveway twelve feet high and twenty feet wide. In addition to these subways this order provided for an under-ground chamber beneath the platform and baggage house now at the station, and for a baggage room in this under-ground chamber, and for an elevator for transferring baggage to and from this under-ground baggage room and the baggage room above. The order in all its particulars need not be set out. From this order the railroad companies appealed to the Supreme Court, where such proceedings were had that, October 27, 1908, the cause was recommitted to the board of commissioners for further proceedings. The mandate of that date provided that the appellants, or either of them, might file with the board a petition for the modification of the order, that the commissioners should hear evidence in support of such petition and such evidence, offered by any party to the cause, as had reference to the practicability and expense of the construction ordered and appealed from and to the expense of other proposed plans, and that, after such further hearing, the commissioners should make such modifications and alterations of the order, such additions thereto, and such omissions therefrom, as should seem to them just and proper, that they should report the advantages and disadvantages of each plan proposed for eliminating the grade crossing, and the probable cost of the work ordered and of each plan proposed. This mandate further required that the commissioners should report the advantages and disadvantages of the elevator system ordered and the annual cost of operating the elevator together with any objections to a plan for an underpass proposed by the Boston & Maine Railroad. By the terms of the mandate it was not to be construed as limiting the jurisdiction of the commissioners. The terms of this mandate are recited in *C. V. Ry. Co.* v. *State and town of Hartford*, 82 Vt. 145, 152, 72 Atl. 324, which is the second of the cases to which this opinion relates.

This second case is a petition brought to the board of commissioners by the Central Vermont Railway Company, June 30, 1908, and before the report and order in the Bacon case were filed or made. It sets out that the crossing over the tracks, already referred to, is a public highway, is highly dangerous, and

ought in the interest of public safety to be abolished; and represents, as matter of opinion, that it can be abolished by the construction under the eight railroad tracks, referred to, of a highway and a passenger footway.  The petition prays for the abolition of such highway crossing at grade and for the apportionment of the expense of such changes as the public welfare and safety may require among the State, the town of Hartford and the Central Vermont Railway Company.  The commissioners, after hearing, made an order dismissing this petition and from this order the petitioner appealed.  Pending this appeal, December 24, 1908, the Boston & Maine Railroad and the Central Vermont Railway Company brought their joint petition to the commissioners in accordance with the mandate of the Supreme Court that has been referred to, and in that petition set out that the crossing was a highway; and they made therein substantially the same representations as had been made in the sole petition of the Central Vermont, and they prayed that the crossing in question be abolished and for the apportionment of the expense of its abolishment among the joint petitioners, the State of Vermont and the town of Hartford.  In answer to this petition the State of Vermont and the town of Hartford set out, among other things, that the matter thereof had been determined and adjudged by the board of commissioners.  The commissioners refused to hear evidence in support of the joint petition.  Thereupon the Central Vermont Railway Company, in its sole petition then pending on appeal in this Court, made an application praying that the last named case be remanded and consolidated with the Bacon case, the first named of the cases to which this opinion relates.

This Court held that the Boston & Maine Railroad is interested in the question of whether the crossing in question is a public highway, and pointed out in what way it is interested, and further called attention to the fact that it had not been heard on that question, since that question was not raised by the Bacon petition to which it answered, and since it was not a party to the proceedings brought by the Central Vermont in which that question was raised.  We held that the joint petition of the railroad companies was well within the mandate which had been sent down in the Bacon case, but made no order in respect to the Bacon case nor in respect to the joint petition, which was treated as a dependency of that case, since the Bacon case was not before

us. Nevertheless the order dismissing the petition in the case which was before us was reversed *pro forma* and that case was remanded, that all parties interested in the related questions raised by the several petitions might be heard as in one case and the whole matter be embraced in one decree. Reference is again made to *C. V. Ry. Co.* v. *State and town of Hartford,* 82 Vt. 145, 154, 155, 72 Atl. 324. After the opinion referred to was handed down the commissioners heard anew and as one proceeding the Bacon case and the case brought on the petition of the Central Vermont, treating the joint petition as properly filed in the Bacon case and as a part thereof, and made a report, decision and order which they filed June 18, 1909, and which are before us for consideration by virtue of an appeal taken by the Central Vermont Railway Company and the Boston & Maine Railroad.

The commissioners fail to find that the crossing in question is a highway crossing within the meaning of the statute and give at some length their reasons for their inability so to find. It is claimed, however, that there are facts reported which, as matter of law, determine such to be its character. Whether the State of Vermont and the town of Hartford can be made to contribute to the expense of eliminating this grade crossing depends upon whether it is a highway crossing within the meaning of the statute invoked, and the report of the commissioners in that regard, and the questions raised in respect thereto, will be considered at the threshold.

It appeared by the records in the office of the town clerk of the town of Hartford that, in 1863, the selectmen of the town caused to be made a record of the laying out and survey by them of a public highway lying between the Junction House, so-called, and the railroad station. Their survey of the highway began in the range of the northerly end of the Junction House and three rods from the northeast corner thereof. The survey proceeds: "Thence south 69 deg. east, 7 rods and 10 links to the track of the Central Vermont Railroad. Said survey being the northerly line of said highway three rods in width southerly from the said northerly line." The Junction House referred to was afterwards burned, and was subsequently rebuilt in such a manner that the northeast corner of the second structure, now standing. is coincident with the northeast corner mentioned in the survey. At the time of the survey only four of the eight tracks now

between the Junction House and the station were in existence, and those four were the ones nearest to the station. The Junction House looks towards the station, and in front of the hotel, running northerly and southerly, there was, and is, a highway, which will hereinafter be called Main street. Following the recital of the courses and distances given in the survey, the north line of the highway described therein—the line which determines the location of the surveyed highway—begins in the east line of Main street at a point opposite the northeast corner of the Junction House and runs southeasterly through a park, laid out on land held by the Central Vermont, intervening between the Junction House and the railroad tracks, and does not extend to the railroad tracks as they were then, but extends only to within about two feet of the westerly rail of the eighth track from the station, the one nearest to the Junction House, as the tracks now are. It is claimed, however, that, since this line is described in the survey as extending to the railroad track, the description is as though the west rail of the then most westerly track was named, and that the case is one for the application of the principle that, in tracing surveys, courses and distances are governed by fixed monuments, and that so this survey in fact extended to the westerly rail of the most westerly of the railroad tracks, as they then were, and embraced land over which the four westerly, and more recent tracks, extend. But the principle invoked does not apply here. The starting point of the north line of the highway surveyed is not a monument, but is determined only by a course and distance recited in the survey. The reference to the railroad track as the terminal point of said north line can determine nothing without respect to the course to be run, and so cannot be regarded as a monument. The phrase "railroad track" is quite generally used to designate the right of way of a railroad. *Cairo &c. Ry. Co.* v. *Mathews,* 152 Ill. 153, 38 N. E. 623, 625; *Quincy &c. Ry. Co.* v. *People,* 156 Ill. 437, 41 N. E. 162; *Ohio &c. R. Co.* v. *Webber,* 96 Ill. 443, 448; *Huck* v. *Chicago &c. R. Co.,* 86 Ill. 352, 358.

The phrase "railroad track" often means the same as the word "roadway" as used in P. S. 4327. See *Drouin* v. *Boston & Maine Railroad,* 74 Vt. 343, 52 Atl. 957.

Since this is so, since nothing that can properly be called a monument was established by the survey, since such a mistake in

distance, as must have been made on the theory of the appellants, is quite inexplicable, and since this survey refers generally, in the singular, to "the track of the Central Vermont Railroad," it is to be inferred that the selectmen referred to what was, or what they conceived to be, the right of way of the railroad company and not to the westerly rail of the fourth track westerly from the station. No artificial rules of construction apply here, and it is clear, that the highway as surveyed did not extend to the westerly rail of the most westerly track then in existence. *Bagley* v. *Morrill*, 46 Vt. 94.

It is argued in behalf of the railroad companies that in 1863 the westerly line of the right of way of the predecessor of the Central Vermont was a line parallel with and forty-two feet westerly of the most westerly rail of the tracks of the Central as they then were, and a contrary finding by the commissioners was eliminated by them, upon consideration of a request made by the railroad companies. Measurements on plans drawn to a scale, and referred to by the commissioners in their report as accurate, indicate that the north line of the surveyed highway stopped at, or near, this westerly line of the right of way as it is claimed to have existed in 1863.

Under the provisions of an act passed in 1849, and in force in 1863 and thereafter until 1886, a highway could not be laid out across a railroad at grade. Act of 1849, No. 41, §26; *C. V. R. Co.* v. *Royalton*, 58 Vt. 234, 4 Atl. 868; *Conn. & Pass. Rivers R. Co.* v. *St. Johnsbury*, 59 Vt. 320, 10 Atl. 573.

This fact is referred to by the appellants in connection with the argument that the surveyed highway was laid out at grade to the very westerly rail itself of the tracks in existence in 1863. But the statute could not have contemplated that that could be done. If it could have been, then wherever there was but one track a highway might have been laid out on each side of it to the corresponding rail, and persons, animals and other objects, might be within a foot or less of one rail or the other, and so in a position to occasion such a disaster as the statute was aimed to prevent, and still be within the limits of a highway. Highways so constructed would, of course, invite trespasses upon the ground between the rails. The statute must be reasonably interpreted with reference to the evil which it was intended to remedy and the dangers and liabilities which it was intended to avert, and we

do not think that the reference to the statute strengthens the argument that the highway was laid out up to the very iron of the track.

In the recorded survey referred to the highway is described as "laid out through lands claimed to be owned by Isaac B. Culver and by the Central Vermont Railroad Company and in part by Noah B. Safford," and the record recites the award of one dollar to each of such claimed owners.  It is, in substance, argued that this description, in connection with other facts, shows the true construction of the survey to be that it put the east end of the highway surveyed upon the forty-two foot strip of railroad land next west of the most westerly rail as the rails lay in 1863.  The other facts just referred to are these :—In June, 1859, land bounded on one side by this forty-two foot strip was set off to Noah B. Safford on an execution against the Vermont Central Railroad Company.  Within a year this land had been quit-claimed by Safford to one Appleton, by Appleton to one Tilden and by Tilden to Isaac B. Culver.  In 1858, to go back a little, other land bounded on one side by this forty-two foot strip was set off to Noah B. Safford on an execution against the railroad company.  It is claimed by the appellants that the westerly end of the surveyed highway was wholly on land to which either Culver or Safford held title by virtue of the levies and quit-claim deeds referred to, and that so the survey would not have mentioned the Central as claiming any interest in the land surveyed if the survey had not in fact extended easterly over the forty-two foot strip.  The commissioners report that they are unable definitely to locate the land described in the executions referred to. But if the claim of the appellants as to the land set off on the executions is correct, their argument on this point is without force.  Notwithstanding the proceedings on the executions, the railroad company might well be claiming an interest in the lands described therein, and to give the railroad company notice and treat it as a party to the proceedings was but common prudence on the part of the selectmen.  The appellants claim that after the highway in question was laid out the railroad company repurchased what was set off on the executions and received deeds of the same.  The commissioners are unable to find that the deeds referred to did, in fact, convey the land described in the two executions.  But, if we assume that they did, the giving and the

taking of these deeds rather indicate that the railroad company had never relinquished all claim of ownership in the land covered by the deeds, particularly as one of them recites that it is given "in settlement and compromise of litigation and all questions of title."

It ought to be said that the commissioners find that at the present time all of the land between the station and Main street, including the park mentioned, is part of the right of way of the Central Vermont Railway Company. And it ought further to be said, in view of the claims of the railroad company and of the evidence on which they are founded, that we do not understand this finding to mean that the company has not, in some of such land, a greater interest than a mere right of way. We understand that the railroad company claims to own a portion, at least, of this land, in fee, and without going into details with respect to the nature of its claims and holdings, we deem it sufficient for the purposes of this case, and a sufficient protection to the railroad company against possible, or apparent, prejudice in respect to its rights of ownership to say, as we do, that we do not treat the finding of the commissioners as to the company's "right of way" as a denial of any greater or further interest. To prevent misunderstanding the digression made in this paragraph has seemed called for.

Everything in the case indicates that the selectmen, in surveying the highway which they laid out, labored under no misunderstanding and were the victims of no mistake, and the true and only construction to be put upon the survey is such that the land included in it did not extend to the westerly rail of the tracks as they were in 1863, and probably is not crossed by any of the rails now on the ground.

In connection with their claim that the highway surveyed in 1863 extended to the west rail of the fourth track, counting westward from the station, the appellants claim that the owners and operators of what is now the Central Vermont, of their own motion, extended the highway to the platform of the passenger station, that they constructed and maintained and kept in repair planking across their tracks and so dedicated to the public a highway which has been in constant use by the public for more than forty-five years, and that so there is a continuous highway, from Main street to the station, existing in part by the action of

the selectmen and in part as a highway by dedication.  And we understand the claim of the appellants to be that, if the survey caused to be made by the selectmen stopped where we find it did, still the highway laid out by the selectmen was extended by dedication to the station.  In connection with this claim we have first to consider that there was no evidence before the commissioners that a certificate of the completion and opening of the highway laid out for the use of the public was ever filed in the town clerk's office in accordance with the statute, now P. S. 3824, which requires that such certificate be made and recorded, and provides that "the day on which such certificate shall be recorded shall be deemed the time of the opening such highway." *Patchen* v. *Morrison,* 3 Vt. 590; *Patchen* v. *Doolittle,* 3 Vt. 457; *Warren* v. *Bunnell,* 11 Vt. 600; *Emerson* v. *Reading,* 14 Vt. 279; *Blodgett* v. *Royalton,* 14 Vt. 288; *Battles* v. *Braintree,* 14 Vt. 348; *Young* v. *Wheelock,* 18 Vt. 493; *Hyde* v. *Jamaica,* 27 Vt. 443.

The tenor of these cases is that the statutory proceedings, without the recorded certificate that the road is open for travel, do not impress upon the road laid out the character of an actual public highway, and that, without such record, the road does not become a public highway unless, and until, it is recognized by the town as such by some unequivocal act.  It is argued that, in the absence of evidence of the record of this certificate, there is a presumption that such a certificate was recorded or filed for record, that it is to be presumed that the selectmen performed their legal duty in this behalf.  But the burden of showing that the crossing is a public highway was on the appellants under their petitions alleging that it was, and if they relied upon the record of the certificate in support of their contention it was for them to show it.  The record, or a certified copy thereof, was the best evidence upon this point, and without evidence of the destruction or loss or inaccessibility or effacement or mutilation of the record or of books in which it should have been made, secondary evidence could not be let in, and no presumption of regularity could operate, since the case is not one which has to do with records, the antiquity of which of itself suggests any difficulty in producing the best or primary evidence.  The appellants could not resort to the record evidence of the laying out of the highway and stop with its production, and then say that, as to the cer-

tificate of opening required to be recorded, they relied upon a presumption of the regularity of official acts. That presumption is in general about this: Where the regularity of an official act is dependent upon some coexisting or preexisting act or fact there is a presumption in favor of the doing of such act or the existence of such fact. *District of Columbia* v. *Robinson*, 180 U. S. 92, 101; 45 L. Ed. 440, 21 Sup. Ct. 283; *McKinstry* v. *Collins*, 76 Vt. 221, 234, 56 Atl. 985. Where an officer had taken property on a writ of replevin and turned the same over to the plaintiff it was held that there was a presumption that the bond which he took was taken before the property was turned over to the plaintiff. *McKinstry* v. *Collins*, 76 Vt. 221, 56 Atl. 985. Where the secretary of state had issued a license to a foreign insurance company there was held to be a presumption that the company had filed in the proper office a copy of its by-laws, since without this antecedent act the license could not have been legally issued. *Insurance Co.* v. *Wright*, 60 Vt. 515, 12 Atl. 103.

Where school district officers paid out money for repairs on a school-house, and there was no evidence that the district had authorized them so to do, it was held that there was a presumption of previous authorization on the part of the district. *Brock* v. *Bruce*, 59 Vt. 313, 10 Atl. 93.

Where at a sheriff's sale property was sold at a farm house, to which the sale had been adjourned, and there was no evidence that the farm house was not a public place within the meaning of the law, it was presumed that it was, as such fact coexisting with the sale, was essential to the validity of the act of the sheriff in making the sale. *Fairbanks* v. *Benjamin*, 50 Vt. 99.

Where an officer advertised and sold property on an execution, and his return did not show that the property was advertised and sold in the town in which it was taken, as the law required, this attendant fact was presumed. *Jewett* v. *Guyer*, 38 Vt. 209.

Where the treasurer of a town made a payment upon a debt owed by the town, and there was no proof of authorization of the town, it was held that the approbation of the town was to be presumed. *Sargeant* v. *Sunderland*, 21 Vt. 284.

Where, in an action of debt on a jail bond, the plaintiff alleged a commitment to the jail in the city of Vergennes on an execution issuing from Addison County Court, it was held that,

since in one contingency such commitment to that jail would be lawful, the court would presume that such contingency existed, and the declaration was held good.   *Bank* v. *Tucker,* 7 Vt. 134.

Where selectmen made and had recorded a certificate of alteration in a highway necessary to the construction of a railroad, but required to be by agreement between the selectmen and the railroad company, a presumption of the prior agreement requisite to the regularity of the certificate was held to arise. *Wead* v. *St. J. & L. C. R. Co.,* 64 Vt. 52, 24 Atl. 361.   We have other cases which illustrate the general rule which here obtains.

As the rule is above stated there are cases which must be excepted from it, as cases of tax sales, where the regularity of antecedent proceedings must be shown, and cannot be presumed in aid of the regularity of the sale, *Brush* v. *Watson,* 81 Vt. 43, 69 Atl. 141, and the cases there cited.   So too the general statement of the rule as made above is hardly broad enough to cover all cases.   It hardly covers the well established presumption that a letter properly addressed, stamped and mailed reaches its destination in consequence of the regularity of the officials of the postoffice department in the discharge of their duties. *Walworth* v. *Seaver,* 30 Vt. 728, 73 Am. Dec. 332; *Oaks* v. *Weller,* 16 Vt. 63; *Rosental* v. *Carbondale &c. Co.,* 140 U. S. 25, 35 L. Ed. 332, 11 Sup. Ct. 691.

But the rule cannot be so construed as to permit the presumption here claimed—so construed as to alter the rule that the existence and contents of a record must be proved by the record, unless something is shown which prevents or excuses the production of the record.   *Sherwin* v. *Bugbee,* 17 Vt. 337; *Brunswick* v. *McKean,* 4 Me. 508; *United States* v. *Ross,* 92 U. S. 281, 23 L. Ed. 707.

As has been said, or intimated, a road laid out, may, without a certificate of its opening, become an actual public highway in consequence of acts of the town in reference thereto.   The question of the performance, or non-performance, by the town of Hartford of acts having such efficiency was fully considered by the commissioners.   They find that the highway described in the record of 1863 was never worked by the town of Hartford nor by any one under its authority; and the subordinate facts which they report fully sustain this finding.   Stress is laid upon an item in the report of the treasurer of the town for 1874 which

indicates a payment to A. T. Baron of one hundred and sixty dollars for grading between the station and the Junction House. But the commissioners report that they are unable to find that this money was expended for grading within the limits of the highway described in the record; and, upon their attention being called to this finding by a special request, they find that, if Baron was paid for grading at all, the payment must have been for grading elsewhere than within the limits of the highway laid out. They give, too, the grounds of this finding, and they are sufficient to sustain it. August 5, 1908, after these proceedings, including the petition which alleged the crossing to be a highway, were begun, the selectmen of the town went through the form of discontinuing the highway laid out in 1863 and caused their action in that regard to be recorded. This action of the selectmen is of no force either way. If the highway laid out in 1863 had become an actual public highway, open for travel as such, this merely paper discontinuance, made when it was, would not have affected the rights or liabilities of anybody. And since there was no public highway to discontinue, this ostensible discontinuance had no force as a recognition of the highway, for it could not relate back and operate as a previous recognition made at a time material to these proceedings. Whether the selectmen, in August, 1908, thought that the highway did not exist, but feared that the courts would never ascertain the real facts, or whether they thought that the highway might exist, and sought by this formality to evade a liability, it is immaterial to inquire.

But it is claimed that the crossing, or a part of it, became a public highway by dedication and acceptance and by long continued travel over it. This claim is more particularly made in connection with the claim that the town otherwise established a public highway from Main street for a part of the way to the station, and that the dedication was of the rest of the way. But independently of the former claim already ruled upon, the claim that the crossing, or any part of it, is a highway by dedication, acceptance and use, is to be considered.

As has already appeared the tracks of the Central Vermont are immediately in front of the station-building, treating the front as the side, westerly of which lies the Junction House, and, in general, the village. The commissioners find and report that no one can go by team or on foot from the village or the sur-

rounding country to the station nor from the station to the village and the country about it without crossing these tracks, and it appears from their report that such has been the general situation at all times material to this case. In permitting free access to and egress from its station, and in planking between its rails, that such access and egress might be the more convenient, the railroad company did nothing to suggest even the dedication of a highway. For a long time, under a lease or license from the railroad company, the village postoffice was at the station though it has not been there since 1890. The business of the express office and the telegraph office, which are referred to, are, of course, closely connected with that of the railroad company. So, in a measure, was that of the postoffice since the railroads receive, deliver and carry the mails. The fact that the railroad company permitted the patrons of the postoffice, of the express company and of the telegraph company to come and go indiscriminately, together with the throng of passengers, shippers, consignees and others whose business was strictly with the railroad company cannot be considered in itself as evidence of dedication. A railroad company may lease a part of its roadway, as for a coal shed or a lumber shed, if it does not thereby cripple its efficiency in the discharge of its duties to the public. *Osgood* v. *Central Vermont Ry. Co.,* 77 Vt. 334, 60 Atl. 137, 70 L. R. A. 930; *Ide* v. *Boston & Maine Railroad,* 83 Vt. 66, 74 Atl. 401.

And when it does this, the use of its right of way by persons having business on the leased premises is not a circumstance tending to show the dedication of a highway. That a railroad company may make a dedication of a highway across its right of way and tracks has been settled, in cases in which railroad companies have resisted claims similar to that which the appealing companies here assert. But neither the public welfare nor corporate rights require or permit that such acts on the part of a railroad company as have been shown in this case should be considered sufficient evidence to sustain a claim of dedication.

*Williams* v. *New York &c. R. Co.,* 39 Conn. 509, was a case in which the claim was made that a railroad company had by dedication made a public highway of a space which connected with a public street in front of one of its stations, and the facts that appeared therein made the claim much more plausible than is the claim made here, but upon injunction proceedings brought

against the railroad company, it was held that it had not made a dedication of a highway.

In *Lake Erie &c. R. Co.* v. *Town of Boswell,* 137 Ind. 336, 36 N. E. 1103, a railroad company was held to have made a dedication of a highway across its tracks, but, among other things, the company had, as required by statute, filed as a public record a map showing the street dedicated, had furnished to its officers and employees a map showing the street across its right of way, had suffered the town to make, and had cooperated with the town in making improvements upon the street, and had seen houses and churches built and shade trees planted in reliance upon the existence of a highway.

In *Louisville &c. R. Co.* v. *Sonne,* 21 Ky. Law Rep. 848, 53 S. W. 274, the railroad company had, among other things, maintained, at the claimed street for about forty years, warning boards required at highway crossings, and many houses had been erected in reliance upon the existence of the street.  The court thought that the evidence in the case tended to show that the street was a public highway before the railroad company ever acquired its right of way, but held that, however that might be, the railway company could not be permitted to deny the existence of the street.  The commissioners find that in this case neither warning boards were ever put up nor bells rung nor whistles sounded in accordance with the provisions of the statute applicable, if this crossing was in fact a highway.

In connection with the Connecticut case, above referred to, negativing a dedication, reference is made to *Hast* v. *Piedmont &c. R. Co.,* 52 W. Va. 396, 44 S. E. 155, where the insufficiency of such facts as are here relied on to prove a dedication is clearly shown, and where numerous cases and various text books are cited in discussion of the question.

It appears from the commissioners' report that some people live easterly of the station and between it and the Connecticut river, and the commissioners' report shows that, at all times material to the claim of the appellants, persons so residing, including school children, have used the crossing in going to and from the village and that from 1863 till about 1882, when an iron bridge was built across the Connecticut River, people residing at Lebanon, across the river, used the crossing when they had occasion to walk to White River Junction or to walk back.  But this

use and the use already referred to were not evidence of a dedication, which must always be irrevocable. The proposition that the permissive or quasi-permissive use of a railroad company's land in the way indicated does not amount to a dedication has always been successfully maintained by railroad companies. It would be a hard case if the law was otherwise. Besides if the railroad company had intended a dedication and had clearly manifested that intention, the use referred to would not show an adoption on the part of the town authorities. People cannot by going where they will lay out highways at their will. The adoption of a dedicated way as a highway must be evidenced by acts of the proper town authorities, and mere use by the public is not enough. *Town of Clarendon* v. *Rutland R. Co.*, 75 Vt. 6, 9, 52 Atl. 1057; *Tower* v. *Rutland*, 56 Vt. 28; *Folsom* v. *Underhill*, 36 Vt. 580; *Hyde* v. *Jamaica*, 27 Vt. 443; *Pratt* v. *Swanton*, 15 Vt. 147; *Blodgett* v. *Royalton*, 14 Vt. 288; *Page* v. *Weathersfield*, 13 Vt. 424.

A town or other municipality cannot have forced upon it as highways whatever ways and paths individuals may open and lay out with a view to the enhancement of their private property, or for other reasons.

But it is suggested that, though the crossing may not be a legal public highway, it is a road in fact, and that its existence as such is all that is necessary to proceedings under P. S. Chap. 194; that the law invoked deals simply with the dangerous condition regardless of how that condition came to exist. The State, through the exercise of its police power, does deal with such dangerous condition, however it may be that it came to exist; but, in the elimination of this or a like dangerous crossing, the law does not provide for the charge of a part of the attending expense upon the State and a part upon the town unless the crossing is one of the public highways of the State which the town as an instrumentality of the State Government is bound to repair. The subject of highways is fully covered by statutory provisions and we know no such thing as a highway which nobody is bound to repair. "What," said Lord Mansfield in construing an Act of Parliament relating to roads, "are they to continue them and leave them to be impassable." Lofft, 465.

Towns are bound to keep in repair all highways within their respective territorial limits unless there is some special statutory

provision placing that duty in whole or in part elsewhere. P. S. 3807; P. S. 3953-3993; *Moody* v. *Bristol,* 71 Vt. 473, 45 Atl. 1038; *Daniels* v. *Hathaway,* 65 Vt. 247, 26 Atl. 970, 21 L. R. A. 377; *Landon* v. *Rutland,* 41 Vt. 681.

It is said in the brief of one of the appellants that a dedication must be accepted. But this is not the law of Vermont as the cases already cited abundantly show. Burdens cannot be imposed upon towns by any one to whom it occurs that it will be for his advantage to have a highway through or past his land. It is for the towns to determine what shall be highways therein, subject, of course, to the appeals from the action of the selectmen provided by statute.

The commissioners' findings and refusals to find in respect to the claim that the crossing in question is a public highway were all warranted or compelled, and the fact that the crossing is not a public highway is established so far as the report of the commissioners and this decision and opinion can establish it.

And this is as it should be for as was said by Chief Judge Redfield: "Railroad stations should be approached, commonly, by private ways under the control and at the expense of such companies, as well for the convenience of the business of the companies, as the convenience of the public. * * * * One might ask what would be the effect, if the passenger and freight depots at the most frequented points were in the public streets?" *State* v. *Vermont Central R. Co.,* 27 Vt. 103, 109.

With the question of a highway crossing at rest we proceed to the consideration of the other questions before us.

The Public Service Commission finds that the passenger station at White River Junction, and the express office and baggage house there, are situated on a diamond-shaped piece of land enclosed by many railroads in almost constant use. They aptly designate the station as "an island in a sea of traffic"; and that it is so is sufficiently shown by the blue print "No. 24, R. W. S." which was introduced in evidence, found to be accurate, and made a part of the report. Four railroads, two of which are operated by the Boston & Maine, center there, and for a period of twenty years the railroad business there has continuously increased, and a continuance of its growth is anticipated by the commissioners. The dangerous character of the approach to the station was admitted by all parties to the hearing, and the ap-

pellants, which together operate and maintain the station, conceded before the commissioners that the station "is ill adapted to the convenience and needs of the large and constantly increasing traveling public compelled to resort thereto." Under the Bacon petition, the commissioners had, therefore, undoubted authority to eliminate the crossing at grade at the expense of the railroad companies, and to order such repairs and alterations in and about the station as, in the situation presented, the public safety and convenience might reasonably require. To the solution of these problems the commissioners addressed themselves in the report which is made the basis of their order in the premises. On the findings of the commissioners the approach to the station across the tracks at grade must be eliminated, and the commissioners wisely fixed upon a subway, or underpass, as the proper method of rendering the approach to the station consistent with the public safety.

As a part of their order in this regard the commissioners direct the removal of the four westerly tracks of the Central Vermont between the station and Main street, and, to quote from the report, "an almost complete revision of the Central Vermont tracks" at this terminal point. But such an order cannot be made, as an incident to the construction of an underpass or subway, unless it is a necessary incident thereto, for the tracks of the company cannot otherwise be swept from their right of way and the company denied the beneficial use thereof.

The brief for the petitioners in the Bacon case puts the matter in the true light when it says, with reference to the provision of a safe and convenient approach to the station, "if it is necessary to accomplish this that either or both of the roads should change the location of a track or different tracks adjacent to such station, is it probable that it was intended by the legislature that the commission is powerless to order that done."

The commissioners after discussing the plans which they had under consideration finally report that the public safety and convenience require the elimination of the four tracks and the reconstruction of the railroad yard in order to the carrying out of the plan for an underpass. But their previous discussion and findings indicate that they mean no more by this finding than that in their judgment "the best way" to obviate the crossing by an underpass is to require this extensive tearing up and removal

and relocation of tracks. This is, in substance, what the commissioners themselves say before announcing the general finding above referred to; and, in view of the subordinate findings of the commissioners, all of the facts reported, and the plans referred to as authentic and correct, it is obvious that an underpass which will subserve the public safety and convenience can be constructed without involving as an incidental feature thereof the radical changes upon the surface of the right of way which the order requires. That being so the order in that regard cannot be upheld, for the power of the commissioners in respect to railroad corporations is that of supervision and regulation and not that of management and administration.

Management and administration are inseparable from liabilities, risks and responsibilities which attend the exercise of the franchises under which the roads exist. To demand of railroad companies the surrender of the right to manage and administer their affairs would be to demand a surrender of the beneficial use of their property and franchises. Our statute in a large and effective sense gives to the commissioners the right of regulation and supervision of the management by railroad companies of the quasi-public business in which they are engaged; but regulation on the one part and management on the other work together in a salutary way to subserve the public welfare. Without proper regulation the interests of the public at large have been and will be lost sight of. With regulation, obtruding itself into the place of management, capital will recede from the channels of public service, and the industries most useful to the people at large will dwindle, for the incentives to the development, extension and skillful operation of those branches of business which can be said to be ''affected with a public interest'' will, in great measure, be removed. The phrase ''affected with a public interest''; as applied to public service enterprises which are private in their ownership, seems to be a rather happy phrase, used, and apparently invented, by Sir Matthew Hale; and its felicity consists in the fact that it lays no undue emphasis either upon the private character or the public purposes of such enterprises.

The statute gives the Public Service Commission jurisdiction in all matters ''respecting'' railroad crossings, highway grade crossings, signs, signals, gates, flagmen, the location, sufficiency and maintenance of proper depots or stations, the construction

and maintenance of proper fences, cattle guards and farm crossings, the maintenance of tracks, frogs, switches, culverts and bridges, the connections between connecting roads, the manner of operating railroads. And the statute gives the commission jurisdiction in respect to other matters not above referred to. Acts of 1906, No. 126. Acts of 1908, No. 116.

But it is unnecessary as a part of this opinion to enumerate the powers of the commission which are specially named. It is quite true, as is claimed in the brief for the petitioners in the Bacon case, that the broadest jurisdiction over railroad companies which the board has is conferred by the paragraph "said board shall have jurisdiction, on due notice, to hear, determine, render judgment, and make orders and decrees in all matters provided for in the charter of any railroad corporation, or in the statutes of this State relating to railroads." But this does not mean that the commission can do whatever a railway company can do, that the Legislature has undertaken to substitute the board of commissioners for the company's board of directors, or to confer upon the former the proper functions of the latter. It means only that their power of regulation and supervision is broad enough to require of every railroad company the discharge of all its duties to the public, whether those duties are expressed in the charter of the company, or are implied from the nature of its business, or are imposed by some general law to the operation of which the corporation is subject. Since it was argued that the board can do with the plant of a railroad company whatever the company itself can do we deem it pertinent to quote a recent and timely utterance of Mr. Justice White, who speaking for the whole Bench of the Supreme Court of the United States says: "As the public power to regulate railways and the private right of ownership of such property co-exist and do not the one destroy the other, it has been settled that the right of ownership of railway property like other property finds its protection in constitutional guarantees." *'Atlantic &c. R. Co.* v. *Commission,* 206 U. S. 1, 20, 51 L. Ed. 933, 27 Sup. Ct. 585, 592.

We note that these guarantees extend to the use of private property as well as to its mere ownership and title.

In a very recent case the Supreme Court of the United States, in affirming a judgment of the circuit court refusing to enforce a certain order of the Interstate Commerce Commission,

said with great wisdom and emphasis, speaking through the late Mr. Justice Brewer: "It must be remembered that railroads are the private property of their owners, that while from the public character of the work in which they are engaged the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager." *Interstate Commerce Comm.* v. *Chicago &c. Ry. Co.,* 209 U. S. 108, 118, 119, 52 L. Ed. 705, 28 Sup. Ct. 493; see also *Lake Shore &c. Ry. Co.* v. *Smith,* 175 U. S. 684, 43 L. Ed. 858, 19 Sup. Ct. 565.

Of the order in respect to the rearrangement and obliteration of tracks as a part of the plan for an underpass or subway it must be said, in view of all the circumstances, as was said of a certain order under consideration in *State* v. *Speyer,* 67 Vt. 502, 32 Atl. 476, 29 L. R. A. 573, 48 Am. St. Rep. 832, that "it reaches beyond the scope of necessary protection and prevention into the domain of restraint of lawful business and use of property."

The commissioners report that when they made their first order for the elimination of the crossing, the order which included the construction of an underground baggage room and the installation of the elevator, they were led to believe that the cost of carrying out that order would be about $73,480.00. They now find that such cost would amount to $97,000.00. And they find that the plan upon which their first order proceeded is not the best if the order now before us is upheld; but they find that if it is not upheld the plan upon which their former order proceeded is the best solution of the problem with respect to the crossing. But under our holding it will not be the result of this alternative finding that the case goes back for an order in accordance therewith as matter of course. For one thing, there has been no compliance by the commissioners with that part of the mandate of 27 October, 1908, requiring a report as to the advantages and disadvantages of the elevator system ordered and appealed from. For another thing, an underground baggage room, with an elevator to make it accessible, is not, prima facie, a necessary incident to the construction of a safe and convenient underpass, as the mandate referred to implies. Such an underground baggage room and elevator are strangers to our statutes relating to railroads, including the statute which relates to the powers of the commissioners, to the methods of conducting railroad business

in view of which our statutes were enacted; and they cannot be ordered as an incident to an underpass unless they are a necessary incident thereto.

With respect to the approaches to the station, a place where the railroad companies have invited the public to come and do business, the public has the right, in the circumstances, to a subway or subways reasonably safe and convenient, and whatever is necessarily incident thereto may properly be embraced in the order. To such an order the railroad companies must submit, and with its terms they must comply. But costly and novel experiments, not obviously necessary to the subway, they cannot be compelled to make by virtue of the authority of the commissioners to compel the construction of a subway. The opinion of the Supreme Court of the United States in *Wilcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 53 L. Ed. 382, 29 Sup. Ct. 192, contains suggestions calculated to reconcile conservatism with temperate progress and development within constitutional limits, the exercise of governmental authority with private rights, the non-impairment of contracts and liberty to contract with that order and security which rests upon the supremacy of the police power, and we refer to that case as well as to cases already cited as consistent only with the conclusion above announced.

The commissioners' order relates in part to the remodeling of the station itself, and there is no suggestion in the argument for the appellants that the commissioners had not jurisdiction to order the changes which it did in the station proper, nor that their jurisdiction in that regard was not wisely exercised.

The platforms of the station are properly appurtenant thereto, and the commissioners find that an enlargement of the station platform "is very much needed for the convenience and safety of the public." In the brief for the appellants it is said, "as the railroad plan proposes an increase of platform space around the station, and the commission have found that additional space is required, clearly some additional platform space should be ordered in connection with the remodeling of the station." But the order of the commissioners provides for more platform space than the appellants concede to be required; and since this increased platform space involves some, though comparatively slight and inexpensive change of trackage, the railroad companies urge that such change cannot be ordered except

by their consent; and this claim is particularly made by the Boston & Maine in respect to the tracks of the Connecticut & Passumpsic Rivers Railroad which it operates; for it is suggested that this road stands among Vermont railroads in the unique position of existing and being operated under its original charter.

We observe that the charter of the Connecticut & Passumpsic Rivers Railroad gave it no power of lease, and that the lease to the Boston & Maine must have been by virtue of our general law. P. S. 4329; *Pennsylvania R. Co.* v. *St. Louis &c. R. Co.,* 118 U. S. 290, 30 L. Ed. 83, 6 Sup. Ct. 1094.

Of the nature of the lease and the relation of the companies we know nothing except that the lease is for ninety-nine years from 1887, and we do not undertake here to discuss the question of whether or not there has been such a transfer that the Boston & Maine controls the property, subject in express terms to all the general laws of this State in force in 1887. *Rochester Ry. Co.* v. *Rochester,* 205 U. S. 236, 254, 51 L. Ed. 784, 27 Sup. Ct. 469, and cases cited. For the purposes of this case we assume that the lessee stands in all respects in the place of the lessor.

We assume in respect to the Connecticut & Passumpsic Rivers Railroad Company that it exists and is operated by virtue of its original charter granted before the enactment of a general law and before the passage of No. 45, §1, Laws of 1851 which reads: ''Every act creating, continuing, altering or renewing any corporation or body politic which shall hereafter be passed by the general assembly may be altered, amended or repealed whenever the public good may require such alteration, amendment or repeal.'' The charter of this railroad company gives to it the power of locating its tracks and of making alterations, and it is claimed that no change of its trackage at White River Junction can be legally ordered by the commissioners. It is claimed that the order of any alteration, without the consent of the operating company, would be a violation of the contract clause of the Constitution of the United States, and also that it would be a taking of private property for public uses without compensation, without due process of law, and in defiance of the right of the company to the equal protection of the laws.

The Connecticut & Passumpsic Rivers Railroad Company was chartered in 1835 with power to construct a railroad according to its discretion from the southern boundary of the State to its

northern boundary.   Its original charter had no provision making it a public act.   But an amendment thereto, passed in 1845, made the original act, and the amendment, public acts, and as indicated we have taken notice of them as such.   The amendment referred to made White River near its mouth the southern terminus of the road, and preserved to the company its rights under its original charter if it should comply with certain conditions.   But the authority of the company to lay out its line and to lay down its rails in its discretion did not authorize an abuse of discretion, did not authorize it to construct and maintain its station and rails at its terminal point in such juxtaposition as to menace the safety of the public having business with it, and the charter did not and could not and did not attempt to exempt the railroad company from the operation of the police power in respect to matters legitimately within the scope of that power.

That the company owed a duty to the public in respect to the location of its lines was claimed by it and recognized by the Court in an early case.   *Conn. & Pass. Rivers R. Co.* v. *Baxter,* 32 Vt. 805, 807, 816.

The report in the instant case shows that a condition inconsistent with the safety of the traveling public and with a reasonable regard for their comfort has grown up at White River Junction, where, as is the case at all important junctions, people and trucks are necessarily hurrying in various and opposite directions, and that additional platform space is necessary to relieve such situation, and it appears that some change of tracks is a necessary incident of providing platform space which shall be reasonably safe and free from serious discomfort, and so far as a movement of the rails adjacent to the station is such necessary incident, the commissioners have power to order the change. Such moving back from the station, of the railroad tracks, as safety requires is a legitimate exercise of the police power, is not a taking of property without compensation, does not constitute expropriation of property and impairs no contract obligation.

In *Beard* v. *Conn. & Pass. Rivers R. Co.,* 48 Vt. 101, it was held to be beyond question that it was the duty of the company in question to do what was necessary at its depot premises to afford reasonable safety to a traveler.   To the same effect are *Sawyer* v. *Rutland & Burlington R. Co.,* 27 Vt. 370, and *Hale*

v. *Grand Trunk,* 60 Vt. 605, 15 Atl. 300, 1 L. R. A. 187. The right of a railroad company to a practically exclusive occupancy of land in which it has an easement only is based largely upon its duty "to give security to its passengers and workmen." *Jackson* v. *Rutland & Burlington R. Co.,* 25 Vt. 150, 159, 60 Am. Dec. 246.

In 1859 the *Conn. & Pass. Rivers R. Co.,* had judgment in trespass against one whose land had been taken for railroad purposes, and its contention and the judgment of the court were that its possession must be exclusive in order that it might conserve the public safety and discharge its obligations to the community. *Conn. & Pass. Rivers R. Co.* v. *Holton,* 32 Vt. 43, 47. To the same effect is *Troy & Boston R. Co.* v. *Potter,* 42 Vt. 265, 274, 1 Am. Rep. 325.

The rights and liabilities of railroad companies are ably and sensibly discussed by Chief Judge Pierpoint in an early case in this State. With respect to their liabilities he says, among other things: "They are created for the sole purpose of erecting, putting in operation and carrying on a public work, and are authorized to take private property for that purpose, and for that reason. The great object for which they are created and invested with their extraordinary powers, is that that they shall act as carriers of persons and property upon their roads, when completed, and by accepting their charters, constructing and putting in operation their roads, they not only take upon themselves all the duties and liabilities incident to the character of common carriers, but they assume other important duties and liabilities. The public have granted charters for specified purposes, and by accepting them they have obligated themselves to carry out those purposes. They not only have the right to act as common carriers, but they are bound to act as such. The public have the right to insist that they shall continue so to act. They can not throw off this responsibility, and absolutely refuse to discharge their duties, except by an abandonment and surrender of their charters; they can not of their own motion, while acting under their charters and operating their road, divest themselves of their character of common carriers, and refuse to receive and carry passengers upon their roads, or refuse to allow them to come upon their premises at the proper place and time, for the purpose of taking passage. The public, for such purpose, have

the right to enter upon the premises of the corporation by virtue of a higher right than the mere implied revocable license of the corporation, as carriers at common law. It is a part of the contract by which they hold their charters, that the public are to have the right to enter upon the premises acquired under their charters, for the purpose of being carried on their roads, and this is a right which the corporation can not revoke, or refuse to permit the exercise of." *Harris* v. *Stevens,* 31 Vt. 79, 91, 92, 73 Am. Dec. 337.

All this being so, it is idle for a company to claim the charter right to subordinate the enjoyment by the public of its legitimate privileges to the maintenance of dangerous conditions, nuisances and mantraps.

'A railroad is not by such a charter as that in question absolved from the duty of reasonable care and prudence in the construction and maintenance of its road. *Waterman* v. *Conn. & Pass. Rivers R. Co.,* 30 Vt. 610, 615, 73 Am. Dec. 326; *Hatch* v. *Vermont Central R. Co.,* 28 Vt. 142.

The right of the State, irrespective of charter provisions, so to regulate the operation of railroads as to conserve the safety of persons and property was affirmed in this State in *Nelson* v. *Vermont & Canada R. Co.,* 26 Vt. 717, 62 Am. Dec. 614.

*Thorpe* v. *Rutland & Burlington Ry. Co.,* 27 Vt. 140, 62 Am. Dec. 625, is a leading case. It was there claimed that a railroad company, chartered before a general railroad law was enacted, and not bound by its charter to erect and maintain fences and cattle guards, could not be compelled to do so. It was claimed that legislation compelling railroads to do these things modified and violated the charter contract. But the Court held otherwise. It is there said that the police power of the State may subject persons and property in general to restraints and burdens such as are required for the protection "of the lives, limbs, health, comfort and quiet of all persons"; that as to its right to do this in respect to natural persons "no question ever was or upon acknowledged general principles ever can be made"; and that "it is certainly calculated to excite surprise and alarm that the right to do the same in regard to railways should be made a serious question." The case is soundly reasoned and richly illustrated.

By the general railroad law passed after the Connecticut & Passumpsic Rivers Railroad Company was incorporated it was

provided that all railroad companies should be ultimately liable to the day laborers employed by contractors. In the suit of *Branin* v. *The Connecticut & Passumpsic Rivers R. Co.*, 31 Vt. 214, a laborer sought to enforce this liability. The company vigorously defended the suit and contended that the general law as applied to the company was unconstitutional, claiming that it took the property of the corporation without their consent to pay obligations which they never contracted, and that so it impaired the obligation of their charter-contract. But the court held otherwise. Judge Aldis, who wrote the opinion, pointed out the pauperism, breaches of the peace and riots, and the attendent danger to life and property resulting from the inability of workmen to get their pay from irresponsible contractors and declared in behalf of the court that the constitutionality of the statute was beyond question. He said of the act: "It was made to prevent pauperism and breaches of the peace, evils which no person, natural or artificial, can by contract acquire a right to inflict upon the community without restraint from legislative control." The constitutionality of the statute as applied to a railroad incorporated previous to its passage was sustained as an exercise of the police power, and *Thorpe* v. *Rutland & Burlington R. Co.*, 27 Vt. 140, 62 Am. Dec. 625, was referred to as rendering unnecessary a discussion of the right and duty of the Legislature to exercise that power, and also as rendering unnecessary a discussion of its extent and application.

In Cooley's Constitutional Limitations, 6th Edition, the substance of the Thorpe case is given as a two page note, and in accordance therewith it is said in the text, with regard to the contract clause of the Constitution of the United State, that "it has been held without dissent that this clause does not so far remove from the State control the rights and properties which depend for their existence or enforcement upon contracts as to relieve them from the operation of such general regulations for the good government of the State and the protection of the rights of individuals as may be deemed important," and it is added that "all such regulation must be subject to change from time to time as the general well being of the community may require." With specific reference to private corporations in the exercise of their charter powers it is said in the same work and in the same connection that they are "subject to such new regulations as from

time to time may be made by the State with a view to the public protection, health and safety.'' Constitutional Limitations, 707, 708, 709.

The Thorpe case is cited in *Carty's Admr.* v. *Winooski,* 78 Vt. 104, 62 Atl. 45, 2 L. R. A. ( N. S.) 95, where it is said that the police power is ''founded upon the duty of the State to protect the public safety, the public health and the public morals,'' from which unassailable proposition it follows that the State cannot by contract abrogate its powers and duties resting thereon. The right to exercise the police power cannot be sold or bartered or given away. It is an attribute of sovereignty, or rather it is sovereignty itself; and lest its true nature should be misunderstood it is emphatically indicated in Article 5, Chapter 1, of our State Constitution.

The character of the police power is well considered in *State* v. *Theriault,* 70 Vt. 617, 41 Atl. 1030, 43 L. R. A. 290, 67 Am. St. Rep. 677, in which the Thorpe case is cited as a landmark.

The Thorpe case is cited and the pith of it is quoted as law in *Jacobson* v. *Massachusetts,* 197 U. S. 11, 49 L. Ed. 643, 25 Sup. Ct. 358.

It is cited and more extensively quoted from in *Railroad Co.* v. *Husen,* 95 U. S. 465, 24 L. Ed. 527.

So too it is cited with approval in *Missouri &c. Ry. Co.* v. *Haber,* 169 U. S. 613, 42 L. Ed. 878, 18 Sup. Ct. 488.

The case is again cited in *Chicago &c. R. Co.* v. *Chicago,* 166 U. S. 255, 41 L. Ed. 979, 17 Sup. Ct. 581.

In *St. Louis &c. Ry. Co.* v. *Mathews,* 165 U. S. 1, 41 L. Ed. 611, 17 Sup. Ct. 243, the Thorpe case is referred to as a leading one.

It is referred to in *Pennsylvania R. Co.* v. *Miller,* 132 U. S. 75, 33 L. Ed. 267, 10 Sup. Ct. 34, where the principle involved is said to be well set forth in that and other cases, including *Nelson* v. *Vermont & Canada R. Co.,* 26 Vt. 717, 62 Am. Dec. 614, and *Branin* v. *The Connecticut & Passumpsic Rivers R. Co.,* 31 Vt. 214, cases to which reference has already been made.

In the Slaughter Houses Cases, 16 Wall. 36, 21 L. Ed. 394, the view of the police power taken in *Thorpe* v. *Rutland & Burlington R. Co.,* is quoted for the light it throws upon the nature of that power, difficult as it is of precise demarcation.

As has been well said in a recent railroad case in this State: ''It is a settled principle that every holder of property however absolute his title, holds it under the implied liability that his use of it shall not be injurious to the enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property is held subject to general regulation made by the legislature under its police power for the common good and general welfare.'' *Town of Clarendon* v. *Rutland R. Co.,* 75 Vt. 6, 52 Atl. 1057..

The police power and the rights in respect to contracts which are shielded by constitutional protection are considered in the notable case of *The Board of Health* v. *St. Johnsbury,* 82 Vt. 276, 73 Atl. 581, 23 L. R. A. (N. S.) 766, wherein it is said, ''that that protection does not make those rights absolute in all respects, for if it does, what becomes, the courts ask, of the police power, which inheres in every· free government, and is based on the maxim that you shall so use your own property as not to injure the rights of others, which is a universal and prevading obligation, and a condition on which all property is held, the application of which to particular conditions must necessarily be within the reasonable discretion of the Legislature; and that when such discretion is exercised in a given case by means appropriate and reasonable, not oppressive nor discriminatory, it is not subject to constitutional objection.'' See also *Lawrence* v. *Rutland R. Co.,* 80 Vt. 370, 383, 67 Atl. 1091, 15 L. R. A. (N. S.) 350.

The police power rests in the people of the State, and while this right is to be exercised through the legal representatives of the people, one Legislature cannot, by charter-grants or otherwise, so affect that power as to render government a shabby and nominal thing, empty of dignity and palsied in power, but each Legislature, unhampered by the acts of its predecessors, has and must have the right and duty to make such enactments for the well-being of the people as in a proper and strict sense are reserved to the people by virtue of the reservation of the police power.

We are referred to the Dartmouth College case, 4 Wheaton 518, 4 L. Ed. 629; but we are considering a question, that of the police power, practically excluded from consideration there. Precedents are to be applied where they fit, but are not to be tortured.

In *Northern Pac. Ry. Co.* v. *Duluth,* 208 U. S. 583, 52 L. Ed. 630, 28 Sup. Ct. 341, in considering the force and extent of the police power, the Supreme Court of the United States in a unanimous opinion says: ''There can be no question as to the attitude of this Court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one, that it cannot be contracted away, and that a requirement that a company or individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of the obligation of contracts.'' Some cases are cited, and the court then proceeds: ''The result of these cases is to establish the doctrine of the court to be that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not a violation of property rights protected by the Federal Constitution.'' Finally the Court say: ''The exercise of the police power cannot be limited by contract for reasons of public policy, nor can it be destroyed by compromise, and it is immaterial upon what consideration the contract rests, as it is beyond the authority of the State or the municipality to abrogate this power so necessary to the public safety.'' The doctrine of this case has yet more recently been affirmed in *St. Paul &c. Ry. Co.* v. *Minnesota,* 214 U. S. 497, 53 L. Ed. 1060, 29 Sup. Ct. 698.

In *N. Y. & N. E. R. Co.* v. *Bristol,* 151 U. S. 556, 38 L. Ed. 269, 14 Sup. Ct. 437, Mr. Chief Justice Fuller in delivering the unanimous opinion of the Court touched upon every phase of the constitutional question now under consideration in this concluding paragraph:

''The conclusions of this Court have been repeatedly announced to the effect that though railroad corporations are private corporations as distinguished from those created for municipal and governmental purposes, their uses are public, and they are invested with the right of eminent domain, only to be exercised for public purposes; that therefore they are subject to legislative control in all respects necessary to protect the public against danger, injustice, and oppression; that the State has power to exercise this control through boards of commissioners; that there is no unjust discrimination and no denial of the equal protection

of the laws in regulations applicable to all railroad corporations alike; nor is there necessarily such denial nor an infringement of the obligation of contracts in the imposition upon them in particular instances of the entire expense of the performance of acts required in the public interest, in the exercise of legislative discretion; nor are they thereby deprived of property without due process of law, by statutes under which the result is ascertained in a mode suited to the nature of the case, and not merely arbitrary and capricious; and that the adjudication of the highest court of a state, that, in such particulars, a law enacted in the exercise of the police power of the State, is valid, will not be reversed by this Court on the ground of an infraction of the Constitution of the United States.''

Very pertinent to this case is the language of the Supreme Court of the United States in 1896: ''The plaintiff in error took its charter subject to the power of the State to provide for the safety of the public, in so far as the safety of the lives and persons of the people were involved in the operation of the railroad. The company laid its tracks subject to the condition necessarily implied that their use could be so regulated by competent authority as to insure the public safety. And as all property, whether owned by private persons or by corporations, is held subject to the authority of the State to regulate its use in such a manner as not unnecessarily to endanger the lives and the personal safety of the people, it is not a condition of the exercise of that authority that the State shall indemnify the owners of property for the damage or injury resulting from its exercise. Property thus damaged or injured is not, within the meaning of the Constitution, taken for public use, nor is the owner deprived of it without due process of law. The requirement that compensation be made for private property taken for public use imposes no restriction upon the inherent power of the State by reasonable regulations to protect the lives and secure the safety of the people.'' *Chicago, Burlington &c. R. Co.* v. *Chicago,* 166 U. S. 226, 252, 41 L. Ed. 979, 17 Sup. Ct. 581.

A litigation recently arose between certain drainage commissioners in Illinois and the Chicago, Burlington & Quincy Railway Company as to the validity of a requirement of the commissioners that the railway company should remove a bridge and culvert at a certain point, and that, if it continued to maintain

a bridge and culvert there, a substitution should be made in accordance with a plan of drainage adopted by the commissioners. The case went to the Supreme Court of the United States and was there carefully considered, and numerous references to the adjudged cases were made.   The railway company contended that as the bridge in question was lawfully constructed under its corporate powers and was sufficient at the time it was constructed, the foundations thereof could not be ordered removed in the exercise of the police power.   But the Court held otherwise. The Court repelled the suggestion that the adequacy of the bridge and of the opening under it at the time it was constructed determined the obligations of the railroad company to the public for all time.   It refused to put a narrow construction upon the police power of the State and held that, while private property could not be taken for public use without compensation, there was in that case no "taking" in a constitutional sense; for, said the court:   "If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use. * * * The clause prohibiting the taking of private property without compensation is not intended as a limitation upon the exercise of those police powers which are necessary to the tranquillity of every well-ordered community nor of that general power over private property which is necessary for the orderly existence of all government."   *C. B. & Q. Ry. Co.* v. *Drainage Comms.*, 200 U. S. 561, 50 L. Ed. 596, 26 Sup. Ct. 341.

In *Chicago &c. Ry. Co.* v. *Nebraska*, 170 U. S. 57, 42 L. Ed. 948, 18 Sup. Ct. 513, it was said that where the subject matter of contracts affects the safety and welfare of the public the presumption is that such contracts are entered into "with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the police power of the Legislature."

Further cases discussing the constitutional questions raised, all in harmony with the cases cited, are these:   *Union Bridge Co.* v. *United States*, 204 U. S. 364, 51 L. Ed. 523, 27 Sup. Ct. 367; *New Orleans Gas Light Co.* v. *Drainage Commission*, 197 U. S. 453, 49 L. Ed. 831, 25 Sup. Ct. 471; *Gladson* v. *Minnesota*, 166 U. S. 427, 41 L. Ed. 1064, 17 Sup. Ct. 627; *Mobile &c. R. Co.* v. *Mississippi*, 210 U. S. 187, 52 L. Ed. 1016, 28 Sup. Ct. 650;

*Welch* v. *Swasey*, 214 U. S. 91,.53 L. Ed. 923, 29 Sup. Ct. 567; *Baltimore* v. *Baltimore Co.*, 166 U. S. 673, 41 L. Ed. 1160, 17 Sup. Ct. 697.

The difference between the appellants and the commissioners in the matter of platform extension relates to the amount of platform space requisite to the transaction of business with reasonable safety and comfort. This difference seems somewhat marked, but it may be more apparent than real, for the nature and character of the underpass to be ordered, its course, width, grade, and place of termination at the station, may well affect the requirement as to platform space. But the existing situation as to platform space is one of undoubted danger and serious discomfort, and it is for the commission to afford a remedy; and when all matters affecting the platform requirements have been determined by the commissioners in a manner consistent with this opinion, it is for them in the exercise of a sound discretion, since they and the companies agree that the station itself ought not to be moved, to make such orders as the reasonable safety and comfort of travelers and others having business at the station demand; and it is for them to determine what relocation of tracks, upon land already held by the railroad companies, is essential to the provision of such necessarily enlarged platform space.

See *Rutland R. Co.* v. *Bellows Falls &c. R. Co.*, 73 Vt. 20, 50 Atl. 636, and *Rutland-Canadian R. Co.* v. *Central Vermont Ry. Co.*, 72 Vt. 128, 47 Atl. 399.

An order for the moving of the rails of a company sidewise, within the limits of land held by the company, for the purpose of remedying a dangerous condition created by the company, is in no essential respect different from an order that rails be raised or lowered for the like purpose. That a railway company may be guilty of neglect of duty in maintaining its tracks in too close proximity to each other is recognized in *Morrisette* v. *Canadian Pacific Ry. Co.*, 76 Vt. 267, 279, 56 Atl. 1102.

The changes ordered by the commissioners which have not been herein noticed, seem to depend for the propriety of their details upon the plan for an underpass or subway which may be finally adopted, and have not been separately discussed in the hearing before us.

It is suggested by the appellants that this Court on appeal has the power of the commissioners, that it is an Appellate Public Service Commission, and that as such it should deal with this whole matter. But the powers of this Court in that matter are clearly defined by statute and this suggestion cannot be enter-. tained. Acts of 1906, No. 126, §11; Acts of 1908, No. 116, §12; P. S. 4600; *Central Vermont Ry. Co.* v. *State,* 82 Vt. 145, 72 Atl. 324.

*As the crossing is not a public highway, the ruling, or virtual ruling, of the commissioners that the whole expense of the requisite underpass and other changes to be ordered is to be apportioned between the railroad companies is affirmed. The manner in which the expense falling upon them shall be apportioned between them appears to have been agreed upon. The explicit order as to what changes shall be made is reversed and the cause is remanded that the whole matter may be worked out and decreed upon in harmony with the views herein expressed. With the duty resting upon the railroad companies to promptly remedy a confessedly dangerous situation, and with the duty resting upon the Public Service Commission to finally exercise, as soon as may be, its remedial jurisdiction which has been invoked, we have somewhat advanced the consideration of this cause, to the end that both the commissioners and the appellants may, without unnecessary delay, address themselves to the discharge of their duties.*